**Lonnie M. DUNN, Appellant,**

v.

**GROWERS SEED ASSOCIATION, Appellees.**

**No. 9243.**

Court of Civil Appeals of Texas, Amarillo.

July 31, 1981.

Rehearing Denied Aug. 26, 1981.

Thompson & Thomas, George L. Thompson, III, Lubbock, Allen, Matkins, Leck, Gamble & Mallory, David C. Grant, Newport Beach, Cal., for appellant.

Blumrosen & McDonald, Myrtle McDonald, Lubbock, for appellee.

COUNTISS, Justice.

The purpose of this suit is to collect the debt of a Haitian corporation from a United States resident who was an officer and major stockholder in the corporation. The trial court rendered judgment against the stockholder for the amount of the debt, attorney's fees and costs. We must determine whether the trial court correctly imposed individual liability on the stockholder (1) under the alter ego theory or (2) because

he personally guaranteed the debt. We reverse and render.

Appellant Lonnie M. Dunn (hereafter "Dunn") owned eighty percent and the Haitian government owned twenty percent of the stock in a Haitian corporation named Port Dauphin, S.A. The major asset of the corporation was a 40,000 acre plantation in Haiti. Early in 1976 Dunn met with George Babcock, general manager of appellee Growers Seed Association (hereafter "Growers Seed") at the seed company's Lubbock, Texas office to discuss a planting program for the plantation. Soon thereafter, Babcock and two other representatives of Growers Seed visited the plantation and were shown the operation by Dunn, his wife and various plantation management personnel. Before Babcock left the plantation, Dunn gave him a slip of paper which said "Geo. P.O. for seed LMD." Babcock testified he considered the note to be a handwritten purchase order for seed, although no order as to quantity was placed at the time.

Soon after Babcock's visit, however, the corporation ordered, and Growers Seed shipped to it, approximately $8900 worth of seed and other items. The evidence is undisputed that, beginning with the first order, all shipments to the plantation by Growers Seed were made in the name of the corporation, invoices were mailed to the corporation and the account was carried only in the name of the corporation. Growers Seed never maintained an account in Dunn's name.

The corporation mailed Growers Seed a check drawn on a Haitian bank, in payment for the order. Growers Seed was unable to negotiate the check, however, apparently because it was drawn on a foreign bank. The corporation was advised of the problem and, a short time later, when Dunn was in Lubbock to order additional seed, he gave Growers Seed his personal check on a California bank in substitution for the corporation's check. Dunn testified he was subsequently reimbursed by the corporation for his expenditure.

In September 1976, pursuant to Dunn's order, Growers Seed shipped approximately $45,000 worth of seed to the plantation. The shipment was invoiced for payment within thirty days. When the account was not promptly paid, a series of communications ensued between Babcock and Nicholas Barletta, who had been hired by Dunn in mid-1976 as executive vice president and general manager of the corporation.

Babcock met with Barletta in Miami in February 1977 to discuss the unpaid account, as well as the future needs of the plantation for seed. Each sent the other confirming memoranda concerning the Miami meeting. Babcock's letter to Barletta, dated March 2, 1977, stated (as pertinent here):

It is my understanding that you have proposed to make final settlement on seeds now planted during the months of April and May. We are agreeable to this, and we will expect checks covering 50% of the account during the month of April and the other 50% during the month of May.

It is also my understanding that you will discuss the entire seed purchase matter with Mr. Lonnie Dunn upon his return to the plantation in mid-March. I have requested, and you have agreed, to attempt to secure Mr. Dunn's or a U.S. corporation's financial responsibility for future shipments of planting seed to Haiti.

Barletta sent a telegram to Babcock, dated March 7, 1977, stating (as pertinent here):

I WISH TO CONFIRM OUR VERBAL UNDERSTANDING REGARDING SEED REQUESTS, THE COMPANY WILL BE PLEASED TO EXECUTE NOTES WE WILL GUARANTEE PAYMENT AS PROMISED. REGARDING THIS CROP NEEDS. SUNFLOWER SEEDS FOR 3,000 ACRES. MILO SEEDS FOR 3,000 . . . .

Babcock then sent Barletta a note to be signed by Barletta for the corporation in the amount of $51,603.37 to cover the balance then due on the corporation's account and a continuing guaranty agreement to be executed by Lonnie Dunn, wherein he per-

sonally guaranteed payment of existing and future corporation debts to Growers Seed. Additional seed was then shipped and invoices sent to the corporation in mid-April 1977. The corporation did not pay the account in April or May and the note and guaranty agreement were never executed.

In June 1977, Babcock contacted Dunn regarding the corporation's overdue account and testified he told Dunn that Growers Seed needed written confirmation that the account would be settled. Dunn responded with a mailgram stating:

> WE HAVE SALE ON LARGE PER-CENT OF HAITIAN PLANTATION TO HAITIAN DEAL IS SUPPOSE TO CLOSE JUNE 23 YOUR ACCOUNT IN LINE TO BE PAID IN FULL AT CLOSING
> SINCERELY
>   LONNIE DUNN

Soon thereafter Dunn sold his stock in the corporation to a Haitian. Dunn testified that at the time of trial, the corporation was still in existence and operating the plantation. The evidence also indicates that the corporation had a substantial net worth at all times while Dunn was the majority stockholder, but often encountered cash flow problems and had difficulty paying its debts as they matured. Dunn also testified that he injected approximately 1.8 million dollars into the corporation while a majority stockholder. The evidence also established that the corporation held one director's meeting between May 1976 and May 1977 and one stockholder's meeting approximately within the same time frame.

After Dunn sold his stock, the corporation paid $10,000 to Growers Seed on the account. Babcock then contacted Dunn, expressed dissatisfaction with the partial payment and requested Dunn to expedite payment of the balance. When the balance was not paid this lawsuit ensued, and the trial court concluded that Dunn was personally liable for the account.

■ By eighteen points of error Dunn purports to attack the legal and factual sufficiency of the evidence to support certain critical findings of fact and conclusions of law by the trial court. We observe, at the outset, that legal and factual sufficiency attacks on conclusions of law are meaningless; such attacks are designed only for an assault on findings of fact. From an analysis of Dunn's arguments, however, it is apparent that he is contending that the facts in the case, as found by the trial court or conclusively established by the evidence, will not justify the imposition of liability on Dunn under either the alter ego theory or the guaranty theory. Because we are required to decide the merits of a point of error "in the light of the statement and argument thereunder," *O'Neil v. Mack Trucks, Inc.*, 542 S.W.2d 112, 114 (Tex.1976), we will resolve the case on the issues argued by Dunn. We will first consider the question of Dunn's liability on the alter ego theory, then determine whether he is liable as a guarantor of the account.

In the recent case of *Torregrossa v. Szelc*, 603 S.W.2d 803, 804 (Tex.1980), the Supreme Court restated the basic rule for measuring personal liability for corporate activities. Quoting from *Pace Corporation v. Jackson*, 155 Tex. 179, 284 S.W.2d 340 (1955), the Court stated:

> " 'Courts will not disregard the corporation fiction and hold individual officers, directors or stockholders liable on the obligations of a corporation except where it appears that the individuals are using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations.' "[1]

---

1. The quotation from *Pace Corporation v. Jackson* is criticized, with considerable justification, by Robert W. Hamilton in 19 R. Hamilton, Business Organizations § 234 (Texas Practice 1973) (footnotes omitted):

   The sheer breadth of this statement renders it almost totally useless. For example, despite the language about "avoiding liability," it is well established that shareholder liability will not result even when there is a single shareholder, and the corporation was formed for the specific purpose of limiting or escaping liability. Any other conclusion would make the whole process of incorporation a snare or a delusion.

■ The rule was stated in broader fashion in *Minchen v. Van Trease*, 425 S.W.2d 435, 437 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.), where the court enumerated various events as justifications for going behind the shield of the corporate entity. Those events are when the corporation is used (1) to perpetrate a fraud, (2) to evade an existing legal obligation, (3) to achieve or perpetrate a monopoly, (4) to protect a crime, (5) to justify a wrong, (6) to circumvent a statute, and (7) when one corporation exists as a mere tool or business conduit of another corporation.

■ Our inquiry, then, is whether the facts summarized above call for a disregard of the corporation fiction. We conclude that they do not for the following reasons. It is undisputed that Growers Seed knowingly dealt with the corporation from the outset and it is apparent that the attempt to impose personal liability on Dunn is an afterthought. Perhaps this is best illustrated by Babcock's letter, written when the account exceeded $50,000, wherein he stated, "I have requested, and you have agreed, *to attempt to secure* Mr. Dunn's or a U.S. corporation's financial responsibility for future shipments of planting seed to Haiti." (Emphasis added.) Thus, like the creditor in *Minchen v. Van Trease, supra*, Growers Seed fully knew and understood it was dealing with a corporation. It knew the essential facts and accepted the situation. *Id.* at 438. *See also Atomic Fuel Extraction Corporation v. Slick's Estate*, 386 S.W.2d 180 (Tex.Civ.App.—San Antonio), *writ ref'd n.r.e. per curiam*, 403 S.W.2d 784 (Tex.1965).

The facts found by the trial court, and the undisputed evidence in this record, do not establish use of the corporate entity by Dunn in any of the ways condemned by the cases cited above. The fact that Dunn personally paid for the first shipment of seed is not significant, when evaluated in the light of his reason for doing so and his reimbursement by the corporation. *See Radio KBUY, Inc. v. Lieurance*, 390 S.W.2d 16 (Tex.Civ.App.—Amarillo 1965, no writ). The fact that the corporation had financial difficulties and problems paying its bills is not significant, *Moore & Moore Drilling Company v. White*, 345 S.W.2d 550, 554 (Tex.Civ.App.—Dallas 1961, writ ref'd n. r. e.), especially in the absence of evidence that Dunn was stripping the corporation of its assets. Were it otherwise, liability could be imposed on every stockholder of a financially troubled corporation. Likewise of no import are the facts that Dunn infused substantial amounts of money into the corporation and may have intermingled his funds and corporate funds to some extent and that the corporation held a minimal number of board and shareholder meetings. *Angus v. Air Coils, Inc.*, 567 S.W.2d 931 (Tex.Civ.App.—Dallas 1978, no writ). In short, the facts of this case, as found by the trial court or conclusively established, do not provide a basis for imposition of personal liability on Dunn for the corporate debt. Points of error four through fifteen are sustained.

■ The second inquiry is whether Dunn can be held responsible for the account as a guarantor. Inferentially acknowledging that a guarantee by Dunn to pay the corporate debt must be in writing and signed by Dunn, Tex.Bus. & Com.Code Ann. § 26.01(a) (Vernon 1968) & (b)(2) (Vernon Supp.1980–1981), Growers Seed contends that Dunn's mailgram and Barletta's telegram sent by him as Dunn's agent, the pertinent parts of which are set out above, satisfy the Statute of Frauds requirement. We do not agree.

The essential elements of a section 26.01 writing were recently restated by the Supreme Court in *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex.1978):

This statute requires that, with respect to the agreements defined therein, there

Hamilton points out that, in contract cases, a major consideration should be whether the claimant dealt voluntarily with the corporation (footnotes omitted):

In the absence of some sort of deception, the creditor more or less assumed the risk of loss when he dealt with a "shell"; if he was concerned, he should have insisted that some solvent third person guarantee the performance by the corporation.

*Id.* 155 Tex. at 226, 284 S.W.2d 340.

must be a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony.

It is apparent that the two writings do not satisfy the stated requirements. Dunn's mailgram is not a promise by him to pay the account; it is simply a statement by him that the account is "in line to be paid" by some unspecified entity when the "deal" closes. *See Boddy v. Gray*, 497 S.W.2d 600, 603–04 (Tex.Civ.App.—Amarillo 1973, writ ref'd). Assuming, without deciding, that Barletta had authority to enter into a guaranty contract for Dunn, Barletta's telegram does not contain the essential elements. We cannot tell from the telegram what is to be paid, who is to pay it or the terms of the "payment as promised." The writings, together or separately, do not contain the essential terms of a contract. Point of error sixteen is sustained. It is not necessary for us to consider Dunn's remaining points of error.

The judgment of the trial court is reversed and judgment rendered that Growers Seed take nothing by this suit against Dunn.