Joe A. CASTLEBERRY, Petitioner,

v.

Byron BRANSCUM et al., Respondents.

No. C–4536.

Supreme Court of Texas.

July 2, 1986.

Rehearing Denied Jan. 14, 1987.

jury found that Branscum and Byboth used Texan Transfer as a sham to perpetrate a fraud. Based on the jury findings, the trial court rendered judgment against Texan Transfer, disregarding its corporate fiction to hold both Byboth and Branscum individually liable. The court of appeals reversed and rendered, holding: (1) there was no evidence to support the jury's findings; (2) the instruction submitted to the jury was defective; and (3) the issues should not have been submitted to the jury because disregarding the corporate fiction is solely a question of law. 695 S.W.2d 643. We reverse the court of appeals judgment and affirm the trial court, because under the applicable law there was some evidence to support the jury's verdict, the objection to the instruction was improper, and disregarding the corporate fiction is a fact question for the jury.

### Disregarding the Corporate Fiction

The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations; but when these individuals abuse the corporate privilege, courts will disregard the corporate fiction and hold them individually liable. *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex.1975); *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d 336, 340 (Tex.1968); *Pace Corp. v. Jackson*, 284 S.W.2d 340, 351 (Tex.1955).

Bill Liebbe, McKool & Vassalo, Dallas, for petitioner.

Allen R. Morris, Dallas, for respondents.

SPEARS, Justice.

Joe Castleberry sued Texan Transfer, Inc. and Byron Branscum and Michael Byboth, individually, on a promissory note signed by the corporation for Castleberry's shares in the closely held corporation. The

■ We disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result.[1] *Bell Oil & Gas Co. v.*

1. Other doctrines besides disregarding the corporate fiction have been used in cases similar to this: fraudulent conveyance, *Texas Sand Co. v. Shield*, 381 S.W.2d 48, 52–53 (Tex.1964) and Tex. Bus. & Comm. Code ch. 24 (Vernon Supp. 1986); the trust fund doctrine, *Henry I. Siegel Co., Inc. v. Holliday*, 663 S.W.2d 824 (Tex.1984); breach of fiduciary duties, *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex.1963); and the denuding theory, *World*

*Broadcasting System, Inc. v. Bass*, 328 S.W.2d 863, 866 (Tex.1959).

These four doctrines and disregarding the corporate fiction have different elements and remedies, and they protect different parties and interests at different times; but they serve very similar ideals and principles. R. Clark, *The Duties of the Corporate Debtor to Its Creditors*, 90 Harv. L. Rev. 505, 540–54 (1972). In prac-

*Allied Chemical Corp.*, 431 S.W.2d at 340. Specifically, we disregard the corporate fiction:

(1) when the fiction is used as a means of perpetrating fraud;[2]

(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation;

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation;

(4) where the corporate fiction is employed to achieve or perpetrate monopoly;

(5) where the corporate fiction is used to circumvent a statute; and

(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.[3]

*Pacific American Gasoline Co. of Texas v. Miller*, 76 S.W.2d 833, 851 (Tex.Civ.App.—Amarillo 1934, writ ref'd). *See also Roy E. Thomas Const. Co. v. Arbs*, 692 S.W.2d 926, 938 (Tex.App.—Ft. Worth 1985), writ ref'd n.r.e. per curiam, 700 S.W.2d 919 (Tex.1985); *Roylex, Inc. v. Langson Bros. Const. Co.*, 585 S.W.2d 768, 771 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.); *Wolf v. Little John Corp. of Liberia*, 585 S.W.2d 774, 778 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.); *Sutton v. Reagan & Gee*, 405 S.W.2d 828, 837 (Tex.Civ.App.—San Antonio 1966, writ ref'd n.r.e.).

■ Many Texas cases have blurred the distinction between alter ego and the other bases for disregarding the corporate fiction and treated alter ego as a synonym for the entire doctrine of disregarding the corporate fiction. *See, e.g., William B. Roberts, Inc. v. McDrilling Co.*, 579 S.W.2d 335 (Tex.Civ.App.—Corpus Christi 1979, no

writ); *Dunn v. Growers Seed Ass'n*, 620 S.W.2d 233, 236–37 (Tex.Civ.App.—Amarillo 1981, no writ). However, as *Pacific American Gasoline Co. of Texas v. Miller* indicates, alter ego is only one of the bases for disregarding the corporate fiction: "where a corporation is organized and operated as a mere tool or business conduit of another corporation."

Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice. *First Nat. Bank in Canyon v. Gamble*, 134 Tex. 112, 132 S.W.2d 100, 103 (1939). It is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. *See Lucas v. Texas Industries, Inc.*, 696 S.W.2d 372, 374 (Tex.1984); *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d at 573–75. Alter ego's rationale is: "if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors." Ballantine, *Corporations* § 123 at 294 (1946).

The basis used here to disregard the corporate fiction, a sham to perpetrate a fraud, is separate from alter ego. It is sometimes confused with intentional fraud; however, "[n]either fraud nor an intent to defraud need be shown as a prerequisite to disregarding the corporate entity; it is sufficient if recognizing the separate corpo-

---

tice, the doctrine of disregarding the corporate fiction functions to "loosen up the level of proof and the atomistic nature of the analyses required in a fraudulent conveyance action explicitly denominated as such." *Id.* at 552.

**2.** The phrase, "a sham to perpetrate a fraud," comes from *Pace Corp. v. Jackson*, 284 S.W.2d at 351.

**3.** Inadequate capitalization is another basis for disregarding the corporate fiction. *Torregrossa v. Szelc*, 603 S.W.2d 803 (Tex.1980); *Tigrett v. Pointer*, 580 S.W.2d 375, 381–82 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.). It is instructive to compare the six categories in *Pacific American Gasoline Co. of Texas v. Miller* with the categories in 2 Hornstein, *Corporation Law and Practice* §§ 752–758 (1959) (same basic categories, but labeled somewhat differently).

rate existence would bring about an inequitable result." *Fletcher*, Cyclopedia Corporations § 41.30 at 30 (Supp.1985); Cary & Eisenberg, *Corporations* 101 (5th ed. 1980); R. Clark, The Duties of the Corporate Debtor to its Creditors, 90 Harv. L. Rev. 505, 543, 44 (1977); 1 Hildebrand, *Texas Corporations* § 5 at 40 (1942); 2 G. Hornstein, *Corporation Law and Practice* § 755 (1959); *See also Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d at 573 (1975); *Pacific American Gasoline Co. of Texas v. Miller*, 76 S.W.2d at 840, 849; *Rose v. Intercontinental Bank, N.A.*, 705 S.W.2d 752, 756 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Tigrett v. Pointer*, 580 S.W.2d 375, 385 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.); *National Marine Service, Inc. v. Thibodeaux*, 501 F.2d 940, 942 (Fifth Cir.1974). Thus, we held in *Pacific American Gasoline Co. of Texas v. Miller* that note holders could disregard the corporate fiction without showing common-law fraud or deceit when the circumstances amounted to constructive fraud. 76 S.W.2d at 840, 849. In *Tigrett v. Pointer*, the Dallas Court of Appeals disregarded the corporate fiction, stating correctly that "[w]hether [the individual] misled them or subjectively intended to defraud them is immaterial ... [f]or the action was so grossly unfair as to amount to constructive fraud." 580 S.W.2d at 385.

■ To prove there has been a sham to perpetrate a fraud, tort claimants and contract creditors must show only constructive fraud. We distinguished constructive from actual fraud in *Archer v. Griffith:*

> Actual fraud usually involves dishonesty of purpose or intent to deceive, whereas constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests.

390 S.W.2d 735, 740 (Tex.1964).

Because disregarding the corporate fiction is an equitable doctrine, Texas takes a flexible fact-specific approach focusing on equity. *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d at 575; *First Nat. Bank in Canyon v. Gamble*, 132 S.W.2d at 103; *Pacific American Gasoline Co. v. Miller*, 76 S.W.2d at 851; *Tigrett v. Pointer*, 580 S.W.2d at 381–82. For example, in *First Nat. Bank in Canyon v. Gamble*, this court held that we would disregard the corporate fiction when the "facts are such that adherence to the fiction would promote injustice and lead to an inequitable result." 132 S.W.2d at 105. More recently, in *Gentry v. Credit Plan Corp. of Houston*, we again took an equitable approach, holding that the purpose in disregarding the corporate fiction "is to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice, and that purpose should not be thwarted by adherence to any particular theory of liability." 528 S.W.2d at 575. Dean Hildebrand, a leading authority on Texas corporation law, stated well the equitable approach: "When this [disregarding the corporate fiction] should be done is a question of fact and common sense. The court must weigh the facts and consequences in each case carefully, and common sense and justice must determine [its] decision." Hildebrand, *Texas Corporations* § 5 at 42 (1942).[4]

---

4. All other major authorities support an equitable approach as well. Ballantine, *Corporations* § 122 (1946) (disregard when there is misuse of the corporate privilege or injustice); Cary & Eisenberg, *Corporations* 80–81 (5th ed. 1980) (disregard when "the facts warrant the application of equitable principles"); 1 Fletcher, *Cyclopedia Corporations* § 41 at 413 (Perm.Ed. 1983) (disregarded in the interests of justice and equity); 19 Hamilton, *Business Organizations* § 237 at 247 (Texas Practice 1973) ("notions of simple justice and fairness"); Henn and Alexander, *Laws of Corporations* § 146 at 344 (3rd ed. 1983) ("Corporateness will not be recognized to produce unjust or undesirable consequences inconsistent with the purpose of the concept [allowing incorporation]"); 2 Hornstein, *Corporation Law and Practice* § 751 at 262 (1959) (disregard when corporation becomes "vehicle for injustice"); Latty, *Subsidiaries and Affiliated Corporations* 191 (1936) ("What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate

### The Evidence

■ In this case, the court of appeals found no evidence to support the jury verdict. The jury instruction presented alternative bases for disregarding the corporate fiction, including using Texan Transfer as a sham to perpetrate a fraud. We turn first to see whether there is some evidence to support this basis, since it is Castleberry's strongest. Under the no evidence test, we consider only the evidence and inferences supporting the jury's findings and disregard the evidence and inferences to the contrary. *Sagebrush Sales Co. v. Strauss*, 605 S.W.2d 857, 859 (Tex.1980).

In June 1980, Branscum, Byboth, and Castleberry formed a partnership to move furniture. Three months later, they incorporated as Texan Transfer, Inc. They each owned one-third of the closely held corporation's shares. Byboth was president; Castleberry was vice-president; and Branscum was secretary-treasurer. Soon thereafter Branscum formed a competing business, Elite Moving. When Castleberry found out about Elite Moving, he filed an assumed name certificate. Castleberry testified that when Branscum found out about the assumed name certificate:

> A He [Branscum] became very upset, [stating] that it was his company and his name, and that if he wanted to start a moving company that it was his prerogative, he could do whatever he wanted to do.
>
> Q Okay.
>
> A And that if I did not sign the name, sign the company name over to him that he would see to it that I would never get anything out of Texan Transfer.
>
> Q I'm sorry, could you repeat that last part?
>
> A That he would see that I never got anything out of Texan Transfer. He would take whatever it had out of it, anything he could to make sure I had nothing.

Branscum made similar statements later to Texan Transfer's bank.

In July 1981, at Byboth's suggestion, Castleberry sold his stock back to the corporation, receiving a corporate promissory note for approximately $42,000. Byboth signed the note as Texan Transfer's president. Texan Transfer made the initial installment payment of $1,000 and then defaulted on the remaining $41,000.

Castleberry testified that after the buyout, Elite Moving began to take over more and more of Texan Transfer's business. Branscum testified that after the buy-out Texan Transfer, Elite Moving, and later Custom Carriers were all in the same business and all operated out of his residence. Controlled by Branscum and Byboth, Texan Transfer allowed Elite Moving to use its employees and trucks. Texan Transfer supposedly loaned Elite Moving its trucks, but Branscum admitted that the companies had no written rental agreement and that no mileage records were kept to show how much Elite Moving owed Texan Transfer. Elite advertised for furniture-moving business in the phone directory and in newspapers, but Texan Transfer did not. Branscum also conceded that Texan Transfer could do Elite Moving's work. While Texan Transfer's business declined, Elite Moving's prospered.

Ken Warren, CPA for Texan Transfer, Custom Carriers, Byboth, and Branscum, testified to Byboth and Branscum's financial handling of Texan Transfer and Elite Moving. For the eighteen months prior to the buy-out agreement, Texan Transfer had a net income of $65,479. After the agreement in 1981, Texan Transfer's annual net income fell to $2,814 and in 1982 it lost more than $16,000. In contrast, the newly formed Elite Moving declared an income in 1982 of $195,765. Castleberry maintained that Texan Transfer's losses were caused by Byboth and Branscum's manipulations, while Byboth and Branscum argued that they were simply natural business losses. The jury was entitled to believe either inference.

Sometime after Castleberry filed suit in April 1982, Branscum told Sue Campbell,

entity, is that liability is imposed to reach an equitable result").

then his wife, that Castleberry "would never get a dime, that he would file bankruptcy before Castleberry got any money out of the company . . . [that] "he would open the company in another name so that Joe [Castleberry] wouldn't get paid." Shortly thereafter in September, 1982, Byboth and Branscum started another furniture moving company, Custom Carriers, Inc. At trial Byboth conceded that Custom Carriers was formed because of this lawsuit. Moreover, according to Joe Freed, owner of Freed Furniture Company, Byboth and Branscum terminated Texan Transfer's contract with Freed Furniture, with whom Texan Transfer did the majority of its business; and they obtained for Custom Carriers the same contract—doing the same deliveries at the same rate. Freed also testified that he had had no problems with Texan Transfer. Freed was at that time the father of Branscum's girlfriend and is now Branscum's father-in-law.

Byboth and Branscum also sold Texan Transfer's means of doing business and its only assets—its trucks—to "independent contractors" of Custom Carriers. With the money, they paid themselves "back salaries."

We hold that this is some evidence of a sham to perpetrate a fraud. A jury could find that Byboth and Branscum manipulated a closely-held corporation, Texan Transfer, and formed competing businesses to ensure that Castleberry did not get paid. Castleberry had little choice but to sell his shares back to the corporation. While this evidence may be no evidence of intentional fraud, constructive fraud, not intentional fraud, is the standard for disregarding the corporate fiction on the basis of a sham to perpetrate a fraud.

In determining if there is an abuse of the corporate privilege, courts must look through the form of complex transactions to the substance. The variety of shams is infinite, but many fit this case's pattern: a closely held corporation owes unwanted obligations; it siphons off corporate revenues, sells off much of the corporate assets, or does other acts to hinder the on-going business and its ability to pay off its debts; a new business then starts up that is basically a continuation of the old business with many of the same shareholders, officers, and directors. *Blank v. Olcovich Shoe Corp.,* 20 Cal.App.2d 456, 67 P.2d 376, 379 (2nd 1937); *Plaza Express Co. v. Middle States Motor Freight, Inc.,* 40 Ill. App.2d 117, 189 N.E.2d 382, 384–85 (1st Dist.1963); *Team Central, Inc. v. Teamco, Inc.,* 271 N.W.2d 914, 923 (Iowa 1979); *Addison v. Tessier,* 65 N.M. 222, 335 P.2d 554, 557 (1959); *Dairy Co-Operative Ass'n v. Brandes Creamery,* 147 Or. 488, 30 P.2d 338, 342 (1934); *Culinary Workers and Bartenders Union v. Gateway Cafe, Inc.,* 91 Wash.2d 353, 588 P.2d 1334, 1343 (1979); *Dummer v. Wheeler Osgood Sales Corp.,* 198 Wash. 381, 88 P.2d 453, 456–458 (1939); *Soderberg Advertising, Inc. v. Kent-Moore Corp.,* 11 Wash.App. 721, 524 P.2d 1355, 1361–62 (1st 1974).

### The Instruction

 The court of appeals also held that the jury instruction on alter ego was reversible error. The trial court submitted the following issue separately for both Byboth and Branscum: "Do you find from a preponderance of the evidence that Texan Transfer, Inc. was the alter ego of the defendant?" [5] This instruction accompanied the issue:

. You are instructed that a corporation may become an "alter ego" or mere extension of the individual if the individual controls the corporation and conducts its business affairs without due regard for the separate corporate nature of the business; or that such separate corporate nature ceased to exist; or if the corporate assets are dealt with by the individual as if owned by the individual; or if corporate formalities are not ad-

---

**5.** Each basis for disregarding the corporate fiction should be pleaded separately. Tex. R. Civ. P. 45, 47. Castleberry only pleaded alter ego, but because Byboth and Branscum did not ob-

ject to the charge for a lack of pleadings, any error was waived. *Murray v. O & A Express, Inc.,* 630 S.W.2d 633, 637 (Tex.1982).

hered to by the corporation; *or if the individual is using the corporate entity as a sham to perpetrate fraud or to avoid personal liability.* You are further instructed that in determining whether the corporation adhered to corporate formalities and maintained a separate existence, you may consider whether the corporation maintained separate offices; maintained separate books; maintained separate employees; had separate stationary; issued stock; held regular meetings of its shareholders and Board of Directors; kept and maintained written records of the proceedings of meetings of the shareholders and Board of Directors; filing of tax returns, entering into contracts, maintenance of bank accounts, holding title to property, and other indicia of a separate corporate entity. You are instructed that *the existence of one or more of these factors may or may not make Texan Transfers, Inc. the alter ego of (defendant). Whether or not Texan Transfer, Inc. was the alter ego of (defendant) should be determined from the total dealings of (defendant) and Texan Transfer, Inc.* (Emphasis added.)

The court's charge defined fraud as constructive fraud: "Fraud is any act, omission, concealment that involves a breach of legal duty, trust, or confidence justly reposed and that is injurious to another person, or by which an undue and unconscionable advantage is taken." The constructive fraud definition was not objected to and thus was tried by consent.

■ The court of appeals found the last part of the instruction defective: "that the existence of one or more of these factors may or may not make Texan Transfer, Inc. the alter ego of (defendant)." "One or more factors" is ambiguous; it is not clear if "one or more factors" refers to the alternative grounds for disregarding the corporate fiction or to the list of corporate formalities. If "one or more factors" refers to the list of corporate formalities, the instruction is incorrect because no one item alone would justify disregarding the corporate fiction. *See Lucas v. Texas Indus-*

*tries, Inc.*, 696 S.W.2d at 374; *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d at 573.

The instruction is also incorrect if "one or more factors" refers to the alternative bases for disregarding the corporate fiction. As noted above, a proper alter ego instruction should include all the relevant factors and consider the total dealings of the corporation and the individual. *Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d at 573. This instruction, however, treats the several alter ego factors as if each factor alone were a sufficient basis for disregarding the corporate fiction (without due regard for the separate corporate nature of the business, *or* whether such separate corporate nature ceased to exist, *or* if the corporate assets are dealt with by the individual as if owned by the individual, *or* if corporate formalities are not adhered to).

■ Although the instruction is erroneous, the defendants have waived error by not properly objecting. Tex. R. Civ. P. Rule 274 provides:

A party objecting to a charge must point out distinctly the matter to which he objects and the grounds of his objection.

The purpose of Rule 274 is to afford trial courts an opportunity to correct errors in the charge, by requiring objections both to clearly designate the error and to explain the grounds for complaint. *Brown v. American Transfer & Storage*, 601 S.W.2d 931, 938 (Tex.1980); *Davis v. Campbell*, 572 S.W.2d 660, 663 (Tex.1978). An objection that does not meet both requirements is properly overruled and does not preserve error on appeal.

The defendants objected:

[T]o the use of the conjunctive word "or" in the special issue as submitted in that same issue. It may confuse the jury or, in the alternative, prejudice the Defendant and the jury may find any one element would necessarily warrant a finding of "we do" to Special Issues No. 1 and No. 2.

This objection fails both requirements of Rule 274. The objection does not distinctly and separately point out the instruction's errors, because it is unclear whether the "any one element" complaint refers to the alternative grounds for disregarding the corporate fiction or to the list of corporate formalities. Moreover, the objection complains of "elements," but the instruction mentions only "factors."

■ The objection also does not adequately explain its grounds. The grounds given here, that the instruction "may confuse the jury" or "prejudice the defendant," are too general since they do not explain why the instruction is legally incorrect or how it would confuse the jury or prejudice the defendants. *Motor 9, Inc. v. World Tire Corp.*, 651 S.W.2d 296, 301 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.); *Quarles v. Smith*, 379 S.W.2d 91, 93 (Tex. Civ.App.—Houston 1964, writ ref'd n.r.e.).

### Jury Question

■ Finally, the court of appeals held that disregarding the corporate fiction is solely a question of law and, therefore, should not be submitted to the jury. We disagree. The different bases for disregarding the corporate fiction involve questions of fact. Except in very special circumstances, fact questions should be determined by the jury. Tex. Const. Art. I, § 15; *State v. Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 293 (Tex.1975). Therefore, we hold that the controlling issues, based on pleadings and some evidence, of the alternative bases for disregarding the corporate fiction should be submitted to the jury. See Tex. R. Civ. P. 279.

We reverse the court of appeals' judgment and affirm the trial court's judgment.

GONZALEZ, J., files a dissenting opinion in which CAMPBELL, WALLACE and ROBERTSON, JJ., join.

GONZALEZ, Justice, dissenting.

Castleberry sued Branscum and Byboth under the doctrine of alter ego. I agree with the court that Castleberry incurred a legal injury. However, I disagree that Castleberry should be able to recover for that injury under the doctrine of alter ego or any other theory which was submitted to the jury. Those theories simply do not apply to the facts of this case. Thus, despite the court's commendable attempt to set guidelines for disregarding the corporate entity, I dissent because I do not agree with all of its statements on the law or with its application to the facts of this case.

### The Sham to Perpetrate a Fraud Theory

While I agree with most of the court's statements on the law for piercing the corporate veil, its standard for disregarding the corporate entity when used as a sham to perpetrate a fraud is far too broad. Prior to this decision, this court consistently held "that personal liability should be imposed on a stockholder only in extraordinary circumstances." *Sagebrush Sales Co. v. Strauss*, 605 S.W.2d 857, 860 (Tex. 1980). *See also Lucas v. Texas Industries, Inc.*, 696 S.W.2d 372 (Tex.1984); *Torregrossa v. Szelc*, 603 S.W.2d 803 (Tex.1980); (recent cases where this court recognized that disregarding the corporate fiction is an extraordinary equitable remedy). Under the court's current analysis, the corporate entity may be pierced, as a sham to perpetrate a fraud, anytime recognition of "the separate corporate existence would bring about an inequitable result." This standard is so broad that it is not a standard. It fails to provide any guidance on the necessary elements to assert a cause of action under this theory. Presumably, a party only needs to assert that it would be unfair or inequitable to recognize the corporate existence; the corporate veil will be pierced whenever the courts do not like the outcome, irrespective of the type of alleged misconduct by the parties. Piercing the corporate existence whenever a party does not receive a "complete" or "fair" recovery is an unworkable approach.

### The Application of the Theory

I also disagree with the court's holding that there was some evidence for piercing the corporate veil based on the grounds of recovery pleaded and submitted to the jury. The court of appeals held there was no evidence on any theory which would allow "piercing the corporate veil." Thus, in our review of this no evidence point, we must examine the record in its most favorable light to Castleberry, considering only the evidence and inferences which support the findings, and rejecting the evidence and inferences contrary to the findings. *Sagebrush Sales*, 605 S.W.2d 857; *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965).

Generally, the courts will not disregard the existence of the corporate entity. *Lucas*, 696 S.W.2d at 374; *First Nat. Bank in Canyon v. Gamble*, 134 Tex. 112, 132 S.W.2d 100, 103 (1939). The courts, however, will "pierce the corporate veil" under appropriate circumstances. *In his attempt to disregard the corporate entity in this case, Castleberry only pleaded an alter ego theory.*

The alter ego doctrine applies when: (1) there is such a unity between the corporation and the individual that the separateness of the corporation has ceased; and (2) the facts are such that holding only the corporation liable would promote injustice. *First Nat. Bank of Canyon*, 132 S.W.2d at 103; *Mortgage & Trust, Inc. v. Bonner & Co.*, 572 S.W.2d 344, 348 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). *See Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex.1975). Thus, the alter ego doctrine may be used to disregard the corporate fiction where a corporation is organized and operated as a mere tool or business conduit of an individual. *Pacific American Gasoline Co. of Texas. v. Miller*, 76 S.W.2d 833, 851 (Tex.Civ.App.—Amarillo 1934, writ ref'd). *Under the alter ego doctrine, the corporate existence, or lack thereof, is the cause of the injustice. See Lucas*, 696 S.W.2d at 376.

In this case, the instruction submitted to the jury on alter ego stated that "a corporation may become an 'alter ego' or mere extension of the individual ... if the individual is using the corporate entity as a sham to perpetrate fraud." Byboth and Branscum failed to object to the inclusion of this theory as a factor for finding alter ego. This court has held that individuals can be liable when it appears they are using the corporate entity as a sham to perpetrate a fraud. *Torregrossa v. Szelc*, 603 S.W.2d 803, 804 (Tex.1980); *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 351 (1955). Therefore, even though the sham to perpetrate a fraud theory for piercing the corporate entity was not pleaded, such a theory was before the jury in the charge. Castleberry, then, had to produce some evidence either under an alter ego theory or under a use of the corporate entity as sham to perpetrate a fraud theory.

Texan Transfer was formed by Branscum, Byboth, and Castleberry as a business partnership for the delivery of furniture. In 1980, Texan Transfer was incorporated with each of the partners owning one-third of the corporation's stock. Shortly after the incorporation of Texan Transfer, Branscum started a moving business, Elite Moving, as a sole proprietorship.[1]

While a stockholder in Texan Transfer, Castleberry found out about Elite Moving, and filed an assumed name certificate for Elite. Castleberry testified that after Branscum found out about the filing:

A He [Branscum] became very upset, that it was his company and his name, and that if he wanted to start a moving company that it was his perogative, he could do whatever he wanted to do.

Q Okay.

A And that if I did not sign the name, sign the company name over to him that he would see to it that I would never get anything out of Texan Transfer.

---

1. Ostensibly, Texan Transfer and Elite Moving were not in competition with one another. Texan Transfer was in the furniture moving business and Elite Moving was in the general moving business.

Q I'm sorry, could you repeat that last part?

A That he would see that I never got anything out of Texan Transfer. He would take whatever it had out of it, anything he could to make sure I had nothing.

Texan Transfer allowed Elite Moving to use its employees and trucks. Branscum admitted the companies had no written rental agreement and that no mileage records were kept to show how much Elite Moving owed Texan Transfer. Furthermore, Elite advertised in the phone directory and newspapers, Texan Transfer did not.

Castleberry eventually became dissatisfied with the business arrangement; he, Branscum and Byboth agreed that the corporation would purchase his stock. A stock purchase agreement and promissory note were executed by Byboth, signing for the corporation as President. The stock sale included two cash payments and the promissory note. Neither Branscum nor Byboth signed the agreement or note in their individual capacity.

The court holds that the above facts and testimony are some evidence either of alter ego or use of the corporate entity as a sham to perpetrate a fraud. I submit that Branscum's statements and actions in forming Elite Moving, while constituting some evidence of usurption of corporate opportunities, are not evidence of alter ego or use of the corporate entity to perpetrate a fraud.

In the six months prior to the stock purchase agreement, Texan Transfer's income dramatically dropped. Castleberry attributed this drop in income to the fact that he, Byboth, and Branscum were no longer working the trucks, but had hired employees to work the trucks. After the stock purchase, Texan Transfer experienced financial difficulties and its assets were sold. Texan Transfer made the first of the two cash payments to Castleberry but did not make the second payment, nor did it make any payments on the promissory note.

In 1982, Branscum and Byboth formed a new corporation, Custom Carriers, Inc. Custom Carriers had the same business address as Texan Transfer and Elite Moving. Branscum and Byboth terminated Texan Transfer's contract with its main customer, Freeds Furniture. Custom Carriers received the contract with Freeds. Branscum and Byboth sold Texan Transfer's only assets, its trucks, to individuals who later became independent contractors for Custom Carriers. Branscum and Byboth paid themselves "back salaries" with the proceeds.

Sometime after Castleberry filed suit, Branscum told his former wife, that "he would open another company ... so that Joe [Castleberry] wouldn't get paid." Byboth also conceded that Custom Carriers was formed because of this lawsuit.

The above statements and actions by Branscum and Byboth in forming Custom Carriers constitute some evidence under either the trust fund doctrine or a theory of denuding the corporate assets. The statements also show that Branscum did not intend to pay the debt. Clearly, Castleberry could assert a claim against Byboth and Branscum for their actions in dealing with the corporate assets. The above statements and evidence, however, are not evidence that *Texan Transfer* was the alter ego of Branscum and Byboth and are not evidence that the corporate entity (Texan Transfer) was used as a sham to perpetrate a fraud on Castleberry.

An additional factor to consider in determining whether Texan Transfer is the alter ego of Byboth and Branscum is that the underlying suit is based in contract and not in tort. *Lucas*, 696 S.W.2d at 375; *Gentry*, 528 S.W.2d at 573; *Bell Oil & Gas Co. v. Allied Chemical Corp.*, 431 S.W.2d 336 (Tex.1968). In contract cases, as opposed to tort cases, the courts are less willing to disregard the corporate entity. This result follows because a plaintiff in a contract case ordinarily has an opportunity to investigate the financial strength of the corporation while dealing with it in a business transaction. *Lucas*, 696 S.W.2d at 375;

*Gentry,* 528 S.W.2d at 573; *Hickman v. Rawls,* 638 S.W.2d 100, 102 (Tex.App.— Dallas 1982, writ ref'd n.r.e.). Castleberry asserts that Byboth and Branscum should be personally liable on a promissory note (a contract) executed by Texan Transfer. As an incorporator, however, Castleberry was more fully aware than other creditors of the potential viability of the corporation; still, he chose to contract only with the corporation and not with Branscum and Byboth in their individual capacities.

The court never states, nor can I determine, how Texan Transfer was the alter ego of Branscum and Byboth or how the corporate entity (Texan Transfer) was used to perpetrate a fraud. I agree with the court that Castleberry was wronged. However, he should not recover under the theories pleaded and submitted to the jury. Castleberry simply did not assert the proper cause of action. Castleberry did not sue because Texan Transfer was a sham, he sued because it stopped doing business and he did not get paid. The corporate entity, Texan Transfer, did not cause Castleberry's legal injury. Therefore, the court of appeals reached the correct result since there was no evidence on any theory for piercing the corporate veil that was either pleaded or submitted to the jury in the charge.

### The Instruction

Finally, I disagree with the manner in which the court handles the submitted instruction. The trial court separately submitted the following issue for both Branscum and Byboth: "Do you find from a preponderance of the evidence that Texan Transfer, Inc. was the alter ego of [Branscum or Byboth]?" Additionally, the trial court submitted the following instruction:

You are instructed that a corporation may become an "alter ego" or mere extension of the individual if the individual controls the corporation and conducts its business affairs without due regard for the separate corporate nature of the business; or that such separate corporate nature ceased to exist; or if the corporate assets are dealt with by the individual as if owned by the individual; or if corporate formalities are not adhered to by the corporation; or if the individual is using the corporate entity as a sham to perpetrate fraud or to avoid personal liability. You are further instructed that in determining whether the corporation adhered to corporate formalities and maintained a separate existence, you may consider whether the corporation maintained separate offices; maintained separate books; maintained separate employees; had separate stationary; issued stock; held regular meetings of its shareholders and Board of Directors; kept and maintained written records of the proceedings of meetings of the shareholder and Board of Directors; filing of tax returns, entering into contracts, maintenance of bank accounts, holding titles to property, and other indicia of a separate corporate entity. You are instructed that *the existence of one or more of these factors may or may not make Texan Transfers, Inc. the alter ego of* [defendant]. Whether or not Texan Transfer, Inc. was the alter ego of [defendant] should be determined from the total dealings of [defendant] and Texan Transfer, Inc.

The submitted instruction contains two errors: (1) it allows the jury to affirmatively answer the issue on theories for piercing the corporate entity which are not included under the alter ego doctrine; and (2) it allows the jury to find alter ego simply because Branscum or Byboth failed to meet one of the "indicia of a separate corporate entity"—any one of the elements in the list of corporate formalities.

The first problem with the submitted instruction is that it allowed the jury to consider theories of recovery which are not included under the doctrine of alter ego. However, Branscum and Byboth failed to object to the inclusion of the improper theories. These theories, then, were "subsumed" in the alter ego issue even though they are not theories under alter ego. Therefore, the sham to perpetrate a fraud theory for piercing the corporate entity

was included in the "alter ego" issue. This error in the trial court's instruction was waived.

Branscum and Byboth, however, objected to the second error in the instruction, stating that the instruction "may confuse the jury or, in the alternative, prejudice the Defendant and *the jury may find any one element would necessarily warrant a finding of 'we do' to Special Issues No. 1 and No. 2."* Thus, Branscum and Byboth objected to the submission of the instruction because it allowed the jury to find alter ego based on failure of Texan Transfer to maintain any of the "elements" in the list of corporate formalities.

The court states that:

> The objection does not distinctly and separately point out the instruction's errors, because it is unclear whether the "any one element" complaint refers to the alternative grounds for disregarding the corporate fiction or to the list of corporate formalities.

721 S.W.2d at 277. The court's interpretation of defendant's objection is hypertechnical. Clearly, Branscum and Byboth stated that the instruction was erroneous because it allowed the jury to find alter ego based on a violation of any one of the "elements" in the list of corporate formalities. In other words, if the jury found that Texan Transfer failed to "maintain separate stationery" (one of the *elements* in the list of corporate formalities), it could then find that Texan Transfer failed to "adhere to corporate formalities" or failed to "maintain a separate corporate existence" (two of the five alternative grounds for disregarding the corporate fiction—"factors"). Thus, the jury could answer "we do" merely on failure to maintain separate stationery. Because the jury's answer could be based on an affirmative finding of a violation of only one of the listed corporate formalities, the instruction was erroneous. I simply cannot comprehend how this court can render against Byboth and Branscum on an issue which allows the jury to find alter ego merely because Texan Transfer

and Branscum and Byboth did not maintain separate stationery.

In holding that the error in the instruction does not require reversal, the court ignores the fact that the submitted instruction is framed in the disjunctive, while its own definition of alter ego is found in the conjunctive. The court states that alter ego:

> is shown from the total dealings of the corporation and the individual, *including* the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership *and* control the individual maintains over the corporation, *and* whether the corporation has been used for personal purposes.

The court, then, states that alter ego may be found by looking at one factor *and* another factor *and* yet another factor. The submitted instruction, however, tells the jury to look at factor one, or, factor two, or, factor three. Thus, the submitted instruction is clearly an erroneous misstatement on the law of alter ego.

This court has repeatedly reversed the trial court for errors in the charge, including erroneous instructions. *Gulf Coast State Bank v. Emenhiser,* 562 S.W.2d 449 (Tex.1978); *Jackson v. Fontaine's Clinics, Inc.,* 499 S.W.2d 87 (Tex.1973). *See also Washington v. Reliable Life Ins. Co.,* 581 S.W.2d 153 (Tex.1979); *Dutton v. Southern Pacific Transportation,* 576 S.W.2d 782 (Tex.1978); *Scott v. Atchinson, Topeka & Santa Fe Ry.,* 572 S.W.2d 273 (Tex. 1978). In *Gulf Coast State Bank,* we held that the instructions given to the jury constituted a misstatement of law. In reversing, we stated that "[a] trial court's charge which does not instruct the jury as to the correct law is improper.... The erroneous charge constituted error which was reasonably calculated to cause and probably did cause the rendition of an improper judgment." 562 S.W.2d at 453–54. Here, as in *Gulf Coast State Bank,* the erroneous instruction constituted a misstatement of

law. We should remand this case to the trial court for a new trial.

Finally, the court takes a unique approach in its review of "preserved error." The court of appeals held that:

> the court's charge as a whole permitted the jury to find that Texan Transfer was [Byboth and Branscum's] alter ego based upon the existence of only one of the factors listed above. Under the court's charge, the jury could have found Texan Transfer to be [Byboth and Branscum's] alter ego upon a finding that "one or more" of the above quoted factors existed.

695 S.W.2d at 645. The court of appeals then held that the erroneous instruction constituted harmful error. The court of appeals reversed the judgment and rendered for Branscum and Byboth, holding there was no evidence of alter ego.

Castleberry, the adversely affected party, had to assert, by point of error on motion for rehearing at the court of appeals, any complaints he had in regard to that court's opinion. In his motion for rehearing and in his writ application before this court, Castleberry only complained that "[t]he Court of Appeals erred in holding that the Court's charge to the jury on the issue of alter ego was fatally defective because the issue and explanatory instruction fairly submitted the controlling issues." Nowhere does Castleberry assert that Branscum and Byboth failed to object to the instruction or that their objection was insufficient. The rule is well established that to raise a point of error before this court, the complaining party must have raised the point on motion for rehearing in the court of appeals. *Albright v. City of Houston*, 677 S.W.2d 487, 488 (Tex.1984); *Smith v. Baldwin*, 611 S.W.2d 611, 618 (Tex.1980).

The court of appeals never had a chance to address whether Branscum and Byboth's objection was sufficiently specific. No complaint was lodged against the objection. The court of appeals is authorized to correct errors in the judgment of the trial court. The court of appeals did not have an opportunity to address this "alleged" error; this entire argument was initiated by the court. Branscum and Byboth were never given an opportunity to respond that their objection was sufficient. This court is authorized to review errors in the judgment of the court of appeals, it is not authorized to assert, on its own initiative, errors that occurred at the trial court.

Ironically, in affirming Castleberry's recovery, the court broadly construes the "alter ego" instruction to include a theory that was not pleaded and that has very little in common with the alter ego doctrine. At the same time, the court strictly construes Branscum and Byboth's objection to the instruction, holding that it insufficient to preserve error, presumably because it fails to specify in which sentence the error occurred. The inconsistency in this approach is apparent.

I agree with the court that the court of appeals incorrectly held that alter ego was a question of law which should not be submitted to the jury. For the above reasons, I would remand this cause to the trial court.

CAMPBELL, WALLACE and ROBERTSON, JJ., join this dissent.