Opinion issued June 28, 2007





 














In The

Court of Appeals

For The

First District of Texas






NO. 01-04-00921-CV

__________


MARCIE M. MCCARTHY, Appellant


V.


WANI VENTURE, A.S., 

SUCCESSOR IN INTEREST TO

 NORGIPS USA, INC., Appellee






On Appeal from the 129th District Court

Harris County, Texas

Trial Court Cause No. 2001-21419






DISSENTING OPINION

 Because the majority errs in concluding that the evidence is legally sufficient
to support the jury's finding that appellant, Marcie McCarthy, primarily for her own
direct personal benefit, caused Triple M Supply, LLC ("TMS") to be used to
perpetrate an actual fraud, and did perpetrate an actual fraud upon appellee, Wani
Venture, A.S., as successor in interest to Norgips USA, Inc. (collectively "Norgips"),
I respectfully dissent. 

 In her fourth issue, McCarthy argues that the trial court erred in entering
judgment against her because there is no evidence that she was a substantial factor
in causing Norgips's injury, that she caused TMS to be used to perpetrate a fraud, and
that a fraud was committed "primarily for her own direct personal benefit." In sum,
she contends that there is no evidence that she "knew of any alleged 'fraudulent
scheme,' much less being a substantial factor, in bringing about the injury to Norgips,
or that money [she] received was related to any fraudulent scheme." 

Standard of Review

 We must sustain a legal sufficiency or "no-evidence" challenge if the record
shows one of the following: (1) a complete absence of evidence of a vital fact, (2)
rules of law or evidence bar the court from giving weight to the only evidence offered
to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a
scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact.
City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). Evidence does not exceed
a scintilla if it does no more than create a mere surmise or suspicion that a fact exists.
Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004). If the evidence at
trial would enable reasonable and fair-minded people to differ in their conclusions,
then jurors must be allowed to do so. City of Keller, 168 S.W.3d at 822. In
conducting a legal sufficiency review of the evidence, a court must consider all of the
evidence in the light most favorable to the verdict and indulge every reasonable
inference that would support it. Id.

 As further explained by the Texas Supreme Court,

 The evidence presented, viewed in the light most favorable to the
prevailing party, must be such as to permit the logical inference [that the
jury must reach]. There must necessarily be a logical connection, direct
or inferential, between the evidence offered and the fact to be proved. 
However, we must also bear in mind the difference between materiality
of the evidence and the issue of evidentiary sufficiency. Simply because
a piece or pieces of evidence are material in the sense that they make a
"fact that is of consequence to the determination of the action more . . .
or less probable," does not render the evidence legally sufficient. 


Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 24-25 (Tex. 1994) (citations omitted). As
Professor McCormick emphasized, "a brick is not a wall." Id. (quoting Charles T.
McCormick, Handbook of the Law of Evidence § 152 (West ed. 1954)). 

Actual Fraud

 Generally, under Texas law, shareholders are not liable for the debts of a
corporation; however, Texas courts will pierce the corporate veil to prevent fraud or
to achieve equity. Castleberry v. Branscum, 721 S.W.2d 270, 271-72 (Tex. 1987). 
In particular, courts will disregard the corporate fiction when individuals exploit the
corporate form as a sham to perpetrate a fraud. Id. at 272. In response to
Castleberry, the Texas Legislature amended article 2.21 of the Texas Business
Corporations Act in 1989 to establish "a clear legislative standard under which the
liability of a shareholder for the obligations of a corporation is to be determined in the
context of contractual obligations and all matters relating thereto." Tex. Bus. Corp.
Act Ann. art 2.21, Comment of Bar Committee--1996 (Vernon 2003). 

 Under article 2.21A, a shareholder has no obligation to the obligees of a
corporation regarding any contractual obligation of the corporation on the basis of
actual or constructive fraud or a sham to perpetrate a fraud, "unless the obligee
demonstrates that the [shareholder] . . . caused the corporation to be used for the
purpose of perpetuating and did perpetrate an actual fraud on the obligee primarily
for the direct personal benefit of the [shareholder] . . . ." Id. art. 2.21A(2) (emphasis
added). Actual fraud occurs when: a. a party conceals or fails to disclose a material fact within
the knowledge of that party, 


 b. the party knows that the other party is ignorant of the fact
and does not have an equal opportunity to discover the
truth,


 c. the party intends to induce the other party to take some
action by concealing or failing to disclose the fact, and 


 d. the other party suffers injury as a result of acting without
knowledge of the undisclosed fact.


Bradford v. Vento, 48 S.W.3d 749, 754-55 (Tex. 2001). The test for cause in fact is
whether an "act or omission was a substantial factor in bringing about injury,"
without which the harm would not have occurred. Doe v. Boys Clubs of Greater
Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995). 

 In accordance with article 2.21A(2) and case law, the trial court instructed the
jury on actual fraud and to answer the following question:

Did Marcella McCarthy cause Triple M Supply, LLC to be used to
perpetrate an actual fraud, and did perpetrate an actual fraud upon
Norgips, primarily for her own direct personal benefit?

 For purposes of this question, you are instructed that to
"cause" is to be a substantial factor in bringing about an
injury that would otherwise not have occurred. There can
be more than one cause. 

The jury answered this question, "Yes." 

 Thus, Norgips had the burden to prove that McCarthy actually did in fact cause 
TMS to be used to defraud Norgips primarily for her own direct personal benefit. 
Here, however, there is no evidence that McCarthy did anything or omitted to do
anything to actually cause TMS to be used to perpetrate an actual fraud, and did
perpetrate an actual fraud, upon Norgips. Nor is there any evidence that she did any
such thing "primarily for her own direct personal benefit." 

 Norgips argues that the evidence is legally sufficient to support the jury's
finding essentially because McCarthy (1) provided $391,000 as seed money to start
up TMS as proposed by her boyfriend, Michael Moschella, and his brother, Anthony
Moschella; (2) admitted that "[d]uring the maiden year for [TMS]," she took an active
role in the business," was vice president, and, held a one-third interest in it; (3)
accepted "both pay checks and benefits from the third party employee leasing
company as salary" and checks from JTM Supply and TMS as her "director's fee" or
"officer's draw"; (4) "went to dinner with Michael and Steve Klubak in Florida"; (5)
knew that TMS was paying the debts of other companies; (6) accepted checks from
TMS "as payment on secured debt owed by JTM"; (7) claimed that Anthony
Moschella stated that "he could do whatever he wanted with the money in any of the
companies' accounts"; (8) although she "reduced her hands-on activities," she
"condoned through her silence and inaction, Anthony's total disregard of his
representation to the State of Texas and Norgips that [TMS] had been organized to
conduct 'lawful business'"; (9) "did not combine the power of her third ownership
with the third ownership of her boyfriend Michael, to take control of the company and
conduct its business lawfully"; (10) did not hire an accountant, invoke her rights to
see a complete set of company books and records, resign as vice president, or assign
or give away her interest in TMS; and (11) she "got her money back" and was made
whole at the expense of TMS. In sum, "she took the route that she thought was the
best way to protect her own initial contribution of $391,000, her fees, her salary, and
her benefits." 

 However, none of this evidence, taken separately or together, supports a logical
inference that McCarthy in fact caused TMS to be used to perpetrate an actual fraud,
and did perpetrate an actual fraud, upon Norgips, primarily for her own direct
personal benefit. In fact, Norgips concedes in its briefing to this Court that McCarthy
"would not admit that she knew anything about Norgips or TMS's transfer of funds
in the year 2000." Although Norgips asserts that the jury was free to disbelieve her
denial of knowledge, it directs us to no evidence in the record that supports an
inference that she in fact had knowledge of Anthony Moschella's dealings with
Norgips. 

 The majority acknowledges that McCarthy testified that her involvement in the
daily affairs of TMS actually ceased in late 1999 or early 2000, she did not regularly
attend board meetings, and was unaware of TMS's purchase agreement with Norgips
until Norgips filed the instant suit. It also notes that she received her last officer's
check in April 2000, before TMS received delivery of Norgips's wallboard.

 Nevertheless, the majority holds that the evidence is legally sufficient to
support the jury's finding. It notes that McCarthy had contributed $391,000 to TMS
as a start-up business; accepted interest payments on her loan and was ultimately fully
repaid, at the expense of Norgips and other creditors; was an "equal participant and
director in most of the entities that participated in defrauding Norgips"; received
health insurance, a salary, officers' draws, and interest payments as compensation
from TMS; and knew that TMS "was paying the debts of other companies." Most
importantly, the majority asserts that McCathy was "aware of the fraudulent business
practices of Anthony Moschella, including using one entity to pay another's bills." 
The majority concludes that the fraudulent operation of TMS "simply would not have
been possible without McCarthy's contributions" and faults her for doing nothing to
stop the practices of Anthony Moschella.

 When the majority makes the conclusory statement that McCarthy "was aware
of the fraudulent business practices of Anthony Moschella," the only evidence in the
record of her knowledge of his activities is that, as testified to by McCarthy herself,
she "[d]idn't like the way Tony did things." She was asked, "what was the source of
the clash between you that led to your leaving the office?" McCarthy answered, "the
interest checks were paid to me and I would question him about why one company
was paying interest that another company owed the debt and he would just shrug me
off. He wouldn't give me answers and stuff like that." She did know that TMS was
paying JTM's debt; however, McCarthy also testified that she took issue with the fact
that Anthony Moschella said he could run the business the way he wanted to and
"[n]o matter what I said or did I couldn't get results from him for anything." 
However, although the majority characterizes this testimony as knowledge of "the
fraudulent business practices of Anthony Moschella," McCarthy actually testified that
she was not even aware of the fact that TMS placed an order with Norgips for sheet
rock until after this lawsuit was filed. Nothing in the record contradicts her testimony
or otherwise shows that she had any knowledge of the Moschella brothers' actions
in regard to Norgips.

 The bottom line is that none of the evidence relied upon by Norgips and the
majority supports an inference that McCarthy actually did anything whatsoever to
intentionally or knowingly cause TMS to be used to perpetrate an actual fraud, and
did perpetrate an actual fraud upon Norgips, primarily for her own direct personal
benefit. As argued by McCarthy, there is simply no evidence that she caused TMS
to be used to perpetrate a fraud, that a fraud was committed "primarily for her own
direct personal benefit," or that any omission by her was a substantial factor in
bringing about Norgips's injury. 

 Simply because Norgips presented many pieces of evidence that might be
considered material does not mean that the evidence is legally sufficient to support
the jury's findings. See Moriel, 879 S.W.2d at 24-25. There is simply no evidence
in the record that McCarthy actually exploited the corporate form of TMS as a sham
to perpetrate a fraud upon Norgips for her own personal gain. Thus, although the
majority has a lot of scattered bricks, it has no wall. See id.

 Accordingly, I would sustain McCarthy's fourth issue, reverse the judgment
of the trial court, and render judgment in favor of McCarthy.



 Terry Jennings

 Justice



Panel consists of Justices Jennings, Hanks, and Higley.


Justice Jennings, dissenting.