Opinion
issued September 10, 2010  

 

 

 

 

 



 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-09-00311-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



MICHAEL A. PHILLIPS, MARIA E. PHILLIPS, and 

QUANTUM INVESTMENT PARTNERS, L.L.C., Appellants

 

V.

 

B.R. BRICK AND MASONRY, INC., Appellee

 

 



On Appeal from the 127th District Court

Harris County, Texas

Trial Court Cause No. 2005-54026

 

 



MEMORANDUM OPINION

          Appellants,
Michael A. Phillips, Maria E. Phillips, and Quantum Investment Partners, L.L.C.
(“Quantum”), challenge the trial court’s judgment, entered after a jury trial,
in favor of appellee, B.R. Brick and Masonry, Inc. (“BR Brick”), in BR Brick’s
suit against appellants for violating the Texas Uniform Fraudulent Transfer Act
(“TUFTA”).[1]  In three of their four issues, appellants
contend that the evidence is legally insufficient to support the jury’s findings
that certain transfers made by Michael were voidable or fraudulent and Maria is
personally liable for Quantum’s role in making the transfers.  In their fourth issue, appellants contend
that the trial court erred in including postjudgment interest in calculating
the amount of damages awarded in the judgment. 

We reverse in part, and affirm in
part.

Background

In 2000, BR Brick, which worked with
Michael on certain masonry projects, was sued for deficient workmanship on
three of the projects.  Two of the
lawsuits settled, but the third resulted in a judgment against BR Brick.  Although Michael had agreed to indemnify BR
Brick against any such judgment, his insurer refused to cover the claim.  In January 2001, BR Brick formally demanded
indemnity from Michael.  After Michael
refused to pay, BR Brick sued him, and, in July 2002, a judgment in favor of BR
Brick was entered in the amount of $310,000, which was modified on appeal to
$662,700.  

The instant suit arose out of BR
Brick’s attempts to collect on its judgment. 
In its Third Amended Original Petition, BR Brick alleged that Michael
had made fraudulent transfers to Quantum to avoid paying the judgment, and it sought
to pierce the liability shield of Quantum to hold Maria personally liable for
“the wrongful conduct of Quantum.”

Michael testified that in the 1980’s
he had declared bankruptcy because his construction business had foundered.  After that, he and Maria, his wife, held all
of their community assets in her name “to protect the family” and avoid probate.  Michael explained that in 2000, Maria formed
Quantum to operate Marble Slab ice cream shops and diversify their income
because “construction has its ups and downs.” 
Although Michael did not own any interest in Quantum, he did “help out
some” and hired Loretta Sheffield to have “day-to-day responsibility for
Quantum.”  Because Michael did not know
“if Quantum had set up or not the [bank] accounts,” he wrote checks to
Sheffield against his construction company bank account to pay for her time and
expenses in setting up the ice cream shops.  In 2001, Michael transferred $190,000 into
Quantum to start up the ice cream shops, and he later transferred more money “to
help keep them going” and for expenses related to “the build out of stores, the
equipment, architectural.”  Michael also transferred
money from Quantum to himself to pay expenses and keep his construction company
operating.  

Michael further testified that after
his relationship with BR Brick ended in 2004, he, in 2005, began subcontracting
to HDE, Inc. on masonry jobs.  Michael directed
HDE to pay Quantum for his services instead of paying him directly.  

Prior to the BR Brick suit, Michael
had been sued a number of times, but he had escaped personal liability because
“the insurance always took care of it.”  In
February 2002, Dallas Fire Insurance (“DFI”), Michael’s insurer, sent him a
“reservation of rights letter,” in which it stated, “there is no coverage under
the [DFI] policies for the contractual indemnity claims of B.R. Brick.”  Regardless, he remained unconcerned that he
might be personally liable to BR Brick because in the previous lawsuits, DFI had
always reserved the right not to pay.  Michael
did not become “seriously” concerned until 2007, when BR Brick first garnished one
of his bank accounts. 

On cross-examination, Michael
admitted that in his 2004 deposition he had stated that Quantum was set up to
work with “flowers.”  He also admitted
that he had failed to disclose to BR Brick a joint bank account that he had in
the Cayman Islands.  Michael denied that
he knew that BR Brick was seeking to satisfy its judgment from his personal
assets.  He noted that BR Brick had never
sought to garnish his construction company bank account, but he admitted that it
had garnished two other bank accounts. 

Maria Phillips testified that any
personal or real property that she and Michael had acquired was held in her
name because “that’s the way that [they had] always done it” since Michael had
gone through bankruptcy.  Maria knew that
BR Brick had sued Michael and DFI had denied coverage for the claim.  She conceded that Michael’s creditors could
not reach assets held in her name.  Maria
explained that she had formed Quantum, a limited liability company, in 2000 to
operate Marble Slab ice cream shops and Michael helped her “oversee everything,”
but he was not a “part owner.”

Loretta Sheffield testified that
Michael had hired her in 2000 to consult with Quantum regarding the ice cream shops.  Maria was the president of Quantum, but
Michael was the “general manager” and was “running the show.”  Michael, doing business as “Michael Phillips
Construction,” wrote checks to Sheffield to pay for her “expenses and debts” in
“setting up” the ice cream shops.  

Donnie Eckhardt, owner of HDE, Inc., testified
that in 2005, Michael began subcontracting to HDE on masonry jobs.  Although Michael had requested that HDE pay Quantum
for his masonry services, HDE had not worked for or with Quantum.  Also, Eckhardt was not familiar with Quantum’s
business, but he understood that it was “Michael’s company.”  

Legal Sufficiency

In their first issue, the Phillipses
and Quantum argue that the evidence is legally insufficient to support the
jury’s findings that the transfer of $399,120 from Michael to Quantum made
payable to Sheffield was fraudulent and voidable because Sheffield was a good
faith transferee who gave reasonably equivalent value in return for the
transfers.  In their second issue, the
Phillipses and Quantum argue that the evidence is legally insufficient to
support the jury’s finding that the transfers from Michael and HDE to Quantum made
payable to Quantum were fraudulent transfers because “Quantum returned . . . an
even greater amount to [Michael].”  In
their third issue, the Phillipses and Quantum argue that the evidence is
legally insufficient to pierce the liability shield of Quantum and hold Maria
liable for the fraudulent transfers to Quantum because no evidence shows that
Maria was Quantum’s alter ego or used Quantum to evade an existing legal
obligation or to perpetuate a fraud.

We will sustain a legal sufficiency
or “no-evidence” challenge if the record shows one of the following: (1) a
complete absence of evidence of a vital fact, (2) rules of law or evidence bar
the court from giving weight to the only evidence offered to prove a vital
fact, (3) the evidence offered to prove a vital fact is no more than a
scintilla, or (4) the evidence establishes conclusively the opposite of the
vital fact.  City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005).  In conducting a legal sufficiency review, a
“court must consider evidence in the light most favorable to the verdict, and
indulge every reasonable inference that would support it.”  Id.
at 822.  If there is more than a
scintilla of evidence to support the challenged finding, we must uphold it.  Formosa
Plastics Corp. USA v. Presidio Eng’rs & Contractors, Inc., 960 S.W.2d
41, 48 (Tex. 1998). “‘[W]hen the evidence offered to prove a vital fact is so
weak as to do no more than create a mere surmise or suspicion of its existence,
the evidence is no more than a scintilla and, in legal effect, is no evidence.’”
 Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (quoting Kindred v. Con/Chem, Inc., 650 S.W.2d
61, 63 (Tex. 1983)).  However, if the
evidence at trial would enable reasonable and fair-minded people to differ in
their conclusions, then jurors must be allowed to do so. Keller, 168 S.W.3d at 822; see
also King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003).  “A reviewing court cannot substitute its
judgment for that of the trier-of-fact, so long as the evidence falls within
this zone of reasonable disagreement.”  Keller, 168 S.W.3d at 822.

Transfers to Quantum Made Payable to Loretta Sheffield

In support of their argument that the
evidence is legally insufficient to support the jury’s answer to Question No.
1, the Phillipses and Quantum assert that Michael made transfers directly to
Sheffield and not to Quantum.

We note that TUFTA section 24.005(a)(1)
provides that “[a] transfer made or obligation incurred by a debtor is
fraudulent as to a creditor . . . if the debtor made the transfer or incurred
the obligation . . . with actual intent to hinder, delay, or defraud any
creditor of the debtor.”  Tex. Bus. & Com. Code Ann. §
24.005(a)(1) (Vernon 2009).  A creditor seeking
relief under TUFTA may obtain avoidance of a transfer made by the debtor with
such actual fraudulent intent “to the extent necessary to satisfy the
creditor’s claim.”  Id. § 24.008(a)(1)
(Vernon 2009).  However, the transferee of
the fraudulent transfer may assert as a defense against avoidance of the
transfer that she “took in good faith and for a reasonably equivalent value.”  Id.
§ 24.009(a) (Vernon 2009); see Hahn v. Love, No. 01-07-00096-CV, 2009
WL 793637, at *6 (Tex. App.—Houston [1st Dist.] Mar. 26, 2009, pet. denied) (noting
that transferee may assert good faith purchaser defense against judgment
creditor seeking to avoid fraudulent transfer). 


The section
24.009(a) good faith defense is an affirmative defense that the party asserting
carries the burden of establishing.  Hahn, 2009 WL 793637, at *6.  A transferee “who takes property with
knowledge of such facts as would excite the suspicions of a person of ordinary
prudence and put him on inquiry of the fraudulent nature of an alleged transfer
does not take the property in good faith and is not a bona fide
purchaser.”  Id. at *7.  If the party
seeking relief fails to submit any element of an affirmative defense to the
jury, he waives that ground on appeal unless the evidence conclusively
establishes the defense.  Tex. R. Civ. P. 279; Akin v. Dahl, 661 S.W.2d 911, 913 (Tex.
1983).  This is because “[i]f a claim is
established as a matter of law, no question must be submitted to the jury for
consideration.”  Bank of Texas v. VR Elec., Inc., 276 S.W.3d 671, 677 (Tex.
App.—Houston [1st Dist.] 2008, pet. denied).

Here, the jury specifically found
that Michael transferred $390,120 to Quantum which was “payable to” Sheffield,
who is not a party to this suit.[2]
Quantum did not ask for a jury instruction on the affirmative defense, none was
given, and the evidence does not conclusively establish the defense.  Thus, Quantum has waived the affirmative
defense.  Also, the evidence shows that
Sheffield was employed by Quantum to consult regarding the start up of the ice
cream shops and to assist with setting up the shops.  Sheffield did not work for Michael’s
construction company from which the cash transfers were made.  Moreover, Michael’s construction company had
no business or other relationship with Quantum. 
Even if Sheffield, acting as Quantum, took the cash transfers from
Michael’s construction company in good faith to pay for her expenses in setting
up the ice cream shops, neither Sheffield nor Quantum provided any reasonably
equivalent value to Michael’s
construction company in exchange for the cash transfers.  For example, the cash transfers were not made in
satisfaction of a loan that Quantum had made to Michael’s construction company,
a capital infusion into Quantum for which Michael’s construction company gained
an ownership interest, payment for products or services provided by Quantum to
Michael’s construction company, or payment for services provided by Sheffield
to Michael’s construction company.  

We conclude that because Michael’s
construction company did not receive any reasonably equivalent value from
Quantum or Sheffield in exchange for the cash transfers, Quantum is not a good
faith transferee.  Accordingly, we hold
that the evidence is legally sufficient to support the jury’s finding that the
transfers from Michael’s construction company to Quantum, which were made
payable to Sheffield, were fraudulent and the evidence does not conclusively
establish that Sheffield or Quantum was a section 24.009(a) good faith
transferee.

We overrule appellants’ first issue.

Transfers to Quantum Made Payable to Quantum

In support of their argument that
Michael received a benefit for his payments to Quantum, the Phillipses and
Quantum rely on In re Jeffrey Bigelow
Design Group, Inc., 956 F.2d 479 (4th Cir. 1992).  They note that in a fraudulent transfer case,
the focus is on “whether the net effect of the transfer has depleted the [debtor’s
assets].”[3]  Id.
at 485.  Here, the record shows that
Michael transferred to Quantum approximately $473,000 and caused HDE to
transfer to Quantum approximately $339,000, for a total of $812,000.  Quantum transferred to Michael approximately
$694,000.[4]  The Phillipses and Quantum assert that they
should be given credit for the transfers from Quantum to Michael in the
analysis of whether the transfers from Michael and HDE to Quantum were fraudulent
transfers. 

The court in Jeffrey Bigelow interpreted a United States Bankruptcy Code
provision that allowed a bankruptcy trustee to avoid fraudulent transfers.  Id.
at 484.  The court stated that “the
proper focus is on the net effect of the transfers on the debtor’s estate, the
funds available to the unsecured creditors.” 
Id.  The debtor, in a three-party transaction,
received infusions of cash from a bank against a line of credit procured for
its benefit by a third-party and then made payments to the bank, not the
third-party, in satisfaction of the line of credit.  Id.
at 480–81. In holding that the transfers were not fraudulent, the court stated that
the creditors should not gain the benefit of the money received from the infusions
from the line of credit and also the benefit of avoided transfers made as
payment against the line of credit.  Id. at 485.    

Here, BR Brick was not a bankruptcy
trustee seeking to avoid transfers to preserve Michael’s estate for unsecured
creditors.  Under TUFTA, BR Brick had to
prove, through the following “badges of fraud,” that Michael made or caused to
be made the transfers to Quantum with actual intent to hinder, delay, or
defraud BR Brick:  

(1)            
the transfer or
obligation was to an insider;

(2)            
the debtor
retained possession or control of the property transferred after the transfer;

(3)            
the transfer or
obligation was concealed;

(4)            
before the
transfer was made or obligation was incurred, the debtor had been sued or
threatened with suit;

(5)            
the transfer was
of substantially all the debtor’s assets;

(6)            
the debtor
absconded;

(7)            
the debtor
removed or concealed assets;

(8)            
the value of the
consideration received by the debtor was reasonably equivalent to the value of
the asset transferred or the amount of the obligation incurred;

(9)            
the debtor was
insolvent or became insolvent shortly after the transfer was made or the
obligation was incurred;

(10)       
the transfer
occurred shortly before or shortly after a substantial debt was incurred; and

(11)       
the debtor
transferred the essential assets of the business to a lienor who transferred
the assets to an insider of the debtor.

Tex. Bus.
& Com. Code Ann. §§
24.005(a)(1), (b) (Vernon 2009).    

Viewing the evidence in the light
most favorable to the verdict, the following badges of fraud are
supported:  Michael transferred or caused
transfers of money to be made to an insider, Quantum, owned by his wife; he
retained control of the money after the transfers because he was Quantum’s
general manager and a signatory on its bank account; Michael had been sued or
threatened with suit by BR Brick before the transfers; the money received by Quantum
was concealed from BR Brick and unavailable to satisfy its judgment; and, though
Michael was routinely transferring cash between himself and Quantum, there is
no evidence that, at the time Michael made the transfers to Quantum, he
received any value in return.  Additionally,
Michael knew that holding assets in a name other than his own protected them
from his creditors.  He knew that BR
Brick had a judgment against him that his insurer would not cover and could
garnish his bank accounts in satisfaction of its judgment.  The transfers were not, as in Jeffrey Bigelow, in satisfaction of a debt
Michael owed to Quantum so the transfers were not a choice by Michael to pay
one creditor over another.  The transfers
out do not equal the amounts that Michael transferred in, and the evidence at
trial did not conclusively prove that the payments to Michael were made in
consideration of the monies he invested. 
Thus, the jury reasonably could have concluded that the transfers were
not for reasonably equivalent value, and that the transfers were made with an
intent to hinder Michael’s creditor.

Accordingly, we hold that the
evidence is legally sufficient to support the jury’s finding that the transfers
from Michael and HDE to Quantum were made with actual intent to hinder, delay,
or defraud BR Brick. 

We overrule appellants’ second issue.

Piercing the Limited Liability Shield of Quantum

In support of their argument that
there is no evidence to support the jury’s finding that Maria was responsible
for the conduct of Quantum, the Phillipses and Quantum assert that she took no
“actions that hindered Quantum’s creditors” and she had no relationship with BR
Brick.

Courts will “disregard the corporate
fiction, even though corporate formalities have been observed and corporate and
individual property have been kept separately, when the corporate form has been
used as part of a basically unfair device to achieve an inequitable result.”[5]  Castleberry
v. Branscum, 721 S.W.2d 270, 271 (Tex. 1986).  This prevents the “use of the corporate
entity as a cloak for fraud . . . or to work an injustice.”  Love v.
State, 972 S.W.2d 114, 119 (Tex. App.—Austin 1998, pet. denied).  Texas
takes a “flexible fact-specific approach” in applying this exceptional equitable
remedy.  Castleberry, 721 S.W.2d at 273. 
Courts are generally “less reluctant to disregard the corporate entity
in tort cases than in breach of contract cases.”  Lucas
v. Tex. Indus., Inc., 696 S.W.2d 372, 375 (Tex. 1984).  

Disregarding the corporate form
“involve[s] some type of wrongdoing” or injustice or inequity.  Wilson
v. Davis, 305 S.W.3d 57, 69 (Tex. App.—Houston [1st Dist.] 2009, no pet.)
(internal citations omitted).  Determination
of “injustice” and “inequity” is not a “subjective perception of unfairness by
an individual [fact-finder]”; rather, these words are indicative of the kinds
of abuse that the corporate structure should not shield, such as fraud or
evasion of existing obligations.  SSP Partners v. Gladstrong Invs. (USA) Corp.,
275 S.W.3d 444, 455 (Tex. 2008). 
Therefore, although the relationship between two entities is a
consideration, another consideration is “whether the entities’ use of limited
liability was illegitimate.”  Id.

When there has been no objection to
the court’s charge, we assess the legal sufficiency of the evidence according
to the instructions given by the trial court to the jury.[6]  Osterberg
v. Peca, 12 S.W.3d 31, 55 (Tex. 2000).  Here, the trial court’s charge, in pertinent
part, reads as follows:

Is Maria Phillips responsible for the conduct of Quantum
Investment Partners L.L.C.?

Maria Phillips is responsible for the conduct of
Quantum Investment Partners L.L.C. if:

1.                
Quantum
Investment Partners L.L.C. was organized and operated as a mere tool or
business conduit of Maria Phillips and there was such unity between Quantum
Investment Partners L.L.C. and Maria Phillips that the separateness of Quantum
Investment Partners L.L.C. had ceased and holding only Quantum Investment
Partners L.L.C. responsible would result in injustice.

In deciding whether there was such unity between
Quantum Investment Partners L.L.C. and Maria Phillips that the separateness of
Quantum Investment Partners L.L.C. had ceased, you are to consider the total dealings
of Quantum Investment Partners L.L.C. and Maria Phillips, including -

a.     the degree to which Quantum Investment Partners L.L.C.’s
property had been kept separate from that of Maria Phillips;

b.     the amount of financial interest, ownership and
control Maria Phillips maintained over Quantum; and

c.      whether Quantum had been used for personal purposes of
Maria Phillips.

2.                
Maria Phillips
used Quantum Investment Partners L.L.C. as a means of evading an existing legal
obligation, and holding only Quantum Investment Partners L.L.C. responsible
would result in injustice.

3.                
Maria Phillips
used Quantum Investment Partners L.L.C. as a sham to perpetrate a fraud, and
holding only Quantum Investment Partners L.L.C. responsible would result in
injustice.

“Fraud” is the breach of some legal or equitable duty
which, irrespective of moral guilt, the law declares fraudulent because of its
tendency to deceive others, to violate confidence, or to injure public
interests.

Thus, Maria could be held personally liable
for the transfers of money made by Michael to Quantum on three theories: alter
ego, evading an existing legal obligation, or sham to perpetrate a fraud.  See
Castleberry, 721 S.W.2d at 272.

Alter Ego

The alter ego theory imposes
liability on a shareholder for corporate obligations when “a corporation is
organized and operated as a mere tool or business conduit of another” and there
is such “unity between corporation and individual that the separateness of the
corporation has ceased and holding only the corporation liable would result in
injustice.”  Id. (citations omitted); Wilson,
305 S.W.3d at 69.  However, the mere fact
that an individual owns a majority or even all of the shares in a corporation
does not make the corporation the alter ego of the individual.  See Dominguez
v. Payne, 112 S.W.3d 866, 870 (Tex. App.—Corpus Christi 2003, no pet.)  Alter ego “is shown from the total dealings
of the corporation and the individual, including (1) the degree to which
corporate formalities have been followed and corporate and individual property
have been kept separately, (2) the amount of financial interest, ownership and
control the individual maintains over the corporation, and (3) whether the
corporation has been used for personal purposes.”  Castleberry,
721 S.W.2d at 272; Wilson, 305 S.W.3d
at 69.  The rationale behind alter ego is
that “‘if the shareholders themselves disregard the separation of the corporate
enterprise, the law will also disregard it so far as necessary to protect
individual and corporate creditors.’”  Wilson, 305 S.W.3d at 69–70 (quoting Henry Winthrop Ballantine, Ballantine on Corporations § 123 at 294
(1946)).

Viewing the evidence in the light
most favorable to the jury’s finding, the record shows that Maria was at least
part-owner of Quantum and its president. 
No evidence addresses the degree to which Maria maintained the corporate
formalities of Quantum or how she managed the company.  Quantum did maintain assets, liabilities, and
equity ledger, and accountants prepared documents for Quantum.  Quantum property was kept separate from
Maria’s personal property as evidenced by the checks written between the
Phillipses’ personal checking account to Quantum and from Quantum to the
Phillipses.  Some checks were written on
the Quantum bank account to pay for personal expenses of the Phillips family.  Michael, who held no ownership interest in
Quantum, was the general manager over Quantum operations and signed all of the
checks in the record written on Quantum’s bank account.  Maria may have allowed Michael to, as BR
Brick asserts, “use Quantum bank accounts to hide his personal assets from his
creditors”; however, the most important fact is that, at the time of the
transfers, neither Maria nor Quantum had any relationship with or obligation to
BR Brick such that Maria could have
been acting as the alter ego of Quantum with respect to BR Brick.  Accordingly, we hold that the evidence is
legally insufficient for the jury to have found that Maria was Quantum’s alter
ego.

Avoid an Existing Legal Obligation

The use of the corporate fiction to
evade an existing legal obligation usually involves an individual or company
transferring assets or using other entities to avoid an existing legal
obligation of the individual or company.  See Dick’s Last Resort of W. End, Inc. v. Mkt./Ross,
Ltd., 273 S.W.3d 905, 912 (Tex. App—Dallas 2008, pet. denied).  In Dick’s
Last Resort, three defendants, Schiff, Dick’s Texas, and Dick’s Holding
Company, manipulated a lease signed by defendant Dick’s Last Resort and
guaranteed by defendant Dick’s Chicago to avoid paying plaintiff Market/Ross one
percent of Dick’s Last Resort’s gross sales as required by a provision in the
lease if the lease was assigned before the term was up.  Id. at
911–12.  The court of appeals found this
evidence sufficient to pierce the corporate veil and hold Schiff, Dick’s Texas,
and Dick’s Texas Holding Company liable for using Dick’s Last Resort to evade
an existing contractual obligation of Dick’s Last Resort and Dick’s Chicago to
“pay rent for the full term of the lease and to make payment under the guaranty
and the 1% provision.”  Id. at 912.

In Klein v. Sporting Goods, Inc., a shareholder of a corporation
formed a second corporation which bought the inventory of the first corporation
at a foreclosure sale and paid off the first corporation’s secured creditor but
left the first corporation’s unsecured creditors unpaid.  772 S.W.2d 173, 174–75 (Tex. App.—Houston
[14th Dist.] 1989, writ denied).  The
shareholder then continued operations under the second corporation.  Id.
at 175.  The court found the evidence
sufficient to support that the shareholder was personally liable for the debts
to the unsecured creditors because he used the foreclosure sale and set up of
the second corporation “as a method to avoid creditors” of the first
corporation.  Id. at 176.

Here, although there is evidence that
Michael used Quantum to evade the legal obligation of his construction business
to BR Brick, there is no evidence that Maria personally or through Quantum,
owed any legal obligation to BR Brick that she tried to avoid.  Maria was not part owner of Michael’s
construction business, and neither Maria nor Quantum had any relationship with
BR Brick.  Thus, there is no evidence in
the record that Maria, unlike the defendants in Dick’s Last Resort and Klein,
used Quantum to avoid an existing legal obligation owed by her or Quantum to BR
Brick.  Accordingly, we hold that the
evidence is legally insufficient for the jury to have found that Maria used
Quantum to evade an existing legal obligation.

 

Sham to Perpetrate a Fraud

Under Castleberry, the “sham to perpetrate a fraud” theory requires a
tort claimant to, at a minimum, show constructive fraud, or the “breach of some
legal or equitable duty which, irrespective of moral guilt, the law declares
fraudulent because of its tendency to deceive others,” by the entity that the
claimant seeks to hold responsible.  721
S.W.2d at 273 (quoting Archer v. Griffith,
390 S.W.2d 735, 740 (Tex. 1964)). 
Nothing, however, precludes a claimant from showing actual fraud, or a
“dishonesty of purpose or intent to deceive” by the entity the claimant seeks
to hold responsible.  See id.;
Lucas, 696 S.W.2d at 375 (“In a tort
case, it is not necessary to find an
intent to defraud.”) (emphasis added). 
The gist of Castleberry is
that the corporate fiction will be disregarded when the “facts are such that
adherence to the fiction would promote injustice and lead to an inequitable
result.”  721 S.W.2d at 273 (internal citation
omitted).  In Castleberry, the court found a sham to perpetrate a fraud when two
shareholders created a new corporation and transferred all of the assets of the
original corporation to it to avoid the original corporation’s obligation to
pay the third shareholder for the buy-back of his shares.  Id.
at 274–75. 

Although with constructive fraud, the
actor’s intent is irrelevant, no evidence shows that Maria or Quantum had a
confidential or fiduciary relationship with BR Brick, Maria breached a legal or
equitable duty that she or Quantum owed to BR Brick, or Maria’s actions tended
to deceive BR Brick.  See Tex.
Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc., 300
S.W.3d 348, 366 (Tex. App.—Dallas 2009, pet. denied) (noting that constructive
fraud includes breach of legal or equitable duty in context of a fiduciary
relationship); In re Estate of Kuykendall,
206 S.W.3d 766, 771 (Tex. App.—Texarkana 2006, no pet.) (noting that constructive
fraud may consist of breach of confidential relationship); Vela v. Marywood, 17 S.W.3d 750, 761 (Tex. App.—Austin 2000), pet. denied, 53 S.W.3d 684 (Tex. 2001)
(“constructive fraud encompasses those breaches that the law condemns as ‘fraudulent’
merely because they tend to deceive others”). 
Accordingly, we hold that Maria’s actions with respect to Quantum were
not constructively fraudulent toward BR Brick. 

BR Brick asserts that Maria’s “dishonesty
of purpose or intent to deceive” can be shown by the fact that she “had a
substantial financial interest in Quantum,” allowed Michael “complete access to
Quantum’s bank accounts,” knew that assets held in hers or Quantum’s name were
not accessible by Michael’s creditors, allowed Michael to “run his construction
business” through Quantum, “knew of the fraudulent activity of Quantum”
including Michael’s using it to hide his assets, and Maria “did nothing to stop
it.”  That Maria had a substantial
financial interest in Quantum is not dispositive of an intent to deceive because
any sole owner of an entity would have a substantial financial interest in the
entity.  That Michael had complete access
to Quantum’s bank account is also unremarkable since he acted as Quantum’s
general manager.  Although Maria was
aware that BR Brick had sued Michael, DFI had denied coverage, and assets not
held in Michael’s name could not be reached by his creditors, BR Brick brought
no evidence addressing Maria’s “dishonesty of purpose or intent to deceive” BR
Brick.  Sheffield testified that Michael
was the general manager of Quantum, and all of the checks drawn on Quantum’s
bank account and those deposited into Quantum’s bank account drawn on the
Phillipses’ personal bank account were signed by Michael.   There is no evidence in the record regarding
Maria’s activities as owner and president of Quantum or about the role she
played, if any, in the transfers from her and Michael’s personal bank accounts,
Michael’s construction account, or HDE.  Because no more than a scintilla of evidence
addresses Maria’s intent, we hold that the evidence is legally insufficient for
the jury to have found that Maria acted with “dishonesty of purpose or intent
to deceive” BR Brick and that she used Quantum to perpetrate a fraud against it.  

We sustain appellants’ third issue.

Accrual of Post-Judgment Interest

In their fourth issue, appellants argue
that the trial court erred in including postjudgment interest in its
calculation of the amount of the underlying judgment because the underlying judgment
did not specify a postjudgment interest rate and BR Brick failed to reform the
judgment on appeal.

In 1997, the Texas Finance Code was codified
by the Texas legislature in “a topic-by-topic revision of the state’s general
and permanent statute law without substantive change.” Tex. Fin. Code Ann. § 1.001(a) (Vernon 1998).  The modified Texas Finance Code provides that
“[a] money judgment of a court in this state must specify the postjudgment
interest rate applicable to that judgment” and “postjudgment interest on a
money judgment of a court in this state accrues during the period beginning on
the date the judgment is rendered and ending on the date the judgment is
satisfied.” Tex. Fin. Code Ann. §§
304.001, 304.005 (Vernon 2006).  The
version of the statute prior to codification provided that “all judgments of
the courts of this state earn interest at the rate published by the consumer
credit commissioner in the Texas Register.”  Act of May 17, 1983, 68th Leg., R.S., ch. 107,
§ 1, 1983 Tex. Gen. Laws 518, repealed by
Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 6, 1997 Tex. Gen. Laws 3601, 3602.  The Texas Supreme Court has held that this
prior version “does not require, as a prerequisite for accruing interest, that
judgments specifically include an award of post judgment interest.”  The
Office of the Attorney Gen. of Tex. v. Lee, 92 S.W.3d 526, 528 (Tex.
2002).  

The Phillipses and Quantum argue that
because BR Brick’s judgment against Michael in the indemnity action did not
specify the postjudgment interest rate, the underlying judgment amount in this
case should be $637,254 rather than $1,096,525, and BR Brick has waived any
claim that it is entitled to postjudgment interest by not seeking to reform the
judgment on appeal.  In support of their
argument, they rely on Wohlfahrt v.
Holloway, 172 S.W.3d 630, 639 (Tex. App.—Houston [14th Dist.] 2005, pet.
denied).[7]  In Wohlfahrt,
the trial court in its judgment set the postjudgment interest rate at ten
percent.  Id.  The appellants
complained that the rate should have been five percent but, in the trial court,
they had only complained that the rate should be six percent.  Id.  The court of appeals held that the appellants
had waived their complaint because their argument on appeal did not comport
with their argument in the trial court.  Id. at 639–40.  

Here, in B.R. Brick’s underlying indemnity
action against Michael, the trial court did not set the postjudgment interest
rate or even specifically award postjudgment interest.  However, considering the directive of section
1.001 that the 1997 changes to the Finance Code were intended to be a
non-substantive codification of the existing statutes together with sections
304.001 and 304.005 and the authority of Lee,
BR Brick was entitled by statute to recover postjudgment interest even though
the indemnity judgment did not mention postjudgment interest and BR Brick did
not seek to reform that judgment on appeal. 
See RAJ Partners, Ltd. v. Darco
Constr. Corp., 217 S.W.3d 638, 653 (Tex. App.—Amarillo 2006, no pet.) (“postjudgment
interest is mandated by statute, and is recoverable even if the trial court’s
judgment does not mention it”).[8]  Accordingly, we hold that the trial court did
not err in including postjudgment interest in calculating the amount of damages
awarded in the underlying judgment.

We overrule appellants’ fourth issue.

 

 

 

 

 

 

Conclusion

          We
reverse that portion of the trial court’s judgment holding Maria personally
liable for the transfers of money made by Michael to Quantum.  We affirm the remainder of the trial court’s
judgment.

 

 

 

                                                                             Terry
Jennings

                                                                             Justice

 

Panel consists of Justices Jennings,
Hanks, and Bland.











[1]           See Tex. Bus. & Com. Code Ann.
§§ 24.01–.13 (Vernon 2009).

 





[2]           In the court’s charge, the jury was
asked, “Did Michael Phillips fraudulently transfer assets to Quantum Investment
Partners L.L.C.?”  The jury answered
“Yes” for all but one of twenty-seven separate transfers from Michael Phillips
Construction made payable to Sheffield.

 





[3]           Appellants also rely on In re Hinsley, 201 F.3d 638, 644 (5th
Cir. 2000).  Because both cases involve
bankruptcy trustees seeking to avoid transfers as fraudulent, we need discuss
only the Jeffrey Bigelow case.

 





[4]           In their briefing, appellants assert
that the total amount of the transfers from Quantum to Michael, as evidenced by
the checks included in Plaintiff’s Exhibit 1, is $788,660.  After a careful review of the exhibit, this
Court’s calculation of the total amount of the checks is approximately
$694,000.

 





[5]           Texas has applied the principles used
to pierce the corporate veil to pierce the liability shield of limited
liability companies.  See Sanchez
v. Mulvaney, 274 S.W.3d 708, 712
(Tex. App.—San Antonio 2008, no pet.).

 





[6]           We note that the law regarding
piercing the corporate veil was modified in 1999 with the adoption of a statute
by the Texas Legislature which narrowed the Castleberry
doctrine by providing that shareholders could not be held individually
liable for “any contractual obligation of the corporation or any matter
relating to or arising from the obligation on the basis that the [shareholder]
is or was the alter ego of the corporation or on the bases of actual or
constructive fraud, a sham to perpetrate a fraud, or other similar theory,”
unless the plaintiff shows that the shareholder “caused the corporation to be
used for the purposes of perpetrating and did perpetrate an actual fraud on the
obligee primarily for the direct personal benefit of the [shareholder].”  See
Tex. Bus. Orgs. Code Ann. §
21.223 (Vernon 2009) (formerly codified at Tex.
Bus. Corp. Act Ann. art. 2.21). 
Neither party here argued that section 21.223 or article 2.21 applied to
BR Brick’s fraudulent transfer claim, and the jury charge issued by the trial
court, without either party objecting to its form, did not reference section
21.223 or article 2.21.  Thus, even if
section 21.223 or article 2.21 might have been applicable to BR Brick’s claims
against Maria, we do not review the sufficiency of the evidence against an
allegedly proper instruction if the defect was never brought to the trial court’s
attention and the instruction never requested.  Osterberg
v. Peca, 12 S.W.3d 31, 55 (Tex. 2000).





[7]           Appellants also rely on El
Universal, Compania Periodistica Nacional, S.A. de C.V. v. Phoenician Imports,
Inc., 802 S.W.2d 799, 804
(Tex. App.—Corpus Christi 1990, writ denied), and Daniell Motor Co., Inc. v. Nw. Bank, 713 S.W.2d 808, 812 (Tex. App.
—Fort Worth 1986, no writ).  However,
appellants cite to the portions of these opinions relating to prejudgment interest.  Phoenician
Imports specifically acknowledges that “[p]ostjudgment interest is a
creation of statute to which appellant is entitled whether or not specifically
awarded in the judgment.”  802 S.W.2d at
804.

 





[8]           See
also SAP Trading Inc. v. Sohani,
No. 14-06-00641-CV, 2007 WL 1599719, at *2 (Tex. App.—Houston [14th Dist.] June
5, 2007, no pet.) (mem. op.) (“Post-judgment interest is mandated by section
304.001 of the Texas Finance Code, and is recoverable whether or not
specifically awarded in the judgment.”); Hinojosa
v. Hinojosa, No. 13-06-00684-CV, 2007 WL 1933586, at *4 (Tex. App.—Corpus
Christi July 5, 2007, no pet.) (mem. op.) (“Post-judgment interest . . . is
automatic and required by statute, even if not specifically awarded or narrated
in the judgment.”); McDonald v. Taber,
No. 05-03-01642-CV, 2004 WL 2915312, at *4 (Tex. App.—Dallas Dec. 17, 2004,
pet. denied) (mem. op.) (“Whether or not specifically awarded in the judgment,
appellant is entitled to postjudgment interest because it is a creation of
statute.”); Rainbow Group, Ltd. v.
Johnson, No. 03-00-00559-CV, 2002 WL 1991141, at *13 (Tex. App.—Austin Aug.
30, 2002, pet. denied) (mem. op.) (noting that post-judgment interest is
mandated by the Texas Finance Code and “is recoverable whether or not
specifically awarded in the judgment.”).