02-09-377-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-09-00377-CV

 

 


 
 
 W. Graeme Roustan
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Michael Sanderson, Wife Ann Gainous, and Ridglea
 Entertainment, Inc.
 
 
  
 
 
 APPELLEES
 
 


 

 

----------

FROM THE 342nd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

In
six issues, Appellant W. Graeme Roustan appeals from the trial court’s judgment
awarding damages to Appellees Michael Sanderson, his wife Ann Gainous, and
Ridglea Entertainment, Inc. (collectively S&G) on their breach of contract
and fraud claims against him.  Because we hold that the evidence is
insufficient to support an award of damages against Roustan individually on S&G’s
breach of contract claim but sufficient to support an award of damages on S&G’s
statutory fraud claim, we reverse in part and affirm in part.

Background

Sanderson
and Gainous wanted to start their own ice rink business, and in November 2004,
Gainous signed a two-year lease for an ice rink in Fort Worth owned by YDIDI, I
LP.  The lease contained an option to purchase the property during the lease
term.  Sanderson and Gainous formed a corporation, Ridglea Entertainment, Inc.,
to operate the business, and they opened for business in December 2004.

In
March 2005, S&G began having equipment problems, which caused problems with
the ice.  They finally identified and repaired the source of the problem at the
end of May 2005.  Because of the problem with the ice, the rink had been closed
for business from March until the end of June.  Meanwhile, in April 2005,
Sanderson contacted Roustan, an investor in and operator of a number of other
ice rinks, about Roustan buying a controlling interest in the couple’s
business.

In
May 2005, Sanderson and Gainous went to Las Vegas to an ice rink convention and
met with Roustan while there.  At the meeting, Roustan gave a presentation about
his ice rink business venture in which he told Sanderson and Gainous about ice
rink facilities he currently owned and others that he planned to acquire in the
next few years.

The
parties signed a purchase agreement on August 1, 2005, in which a new entity,
Roustan Ridglea, LLC (Ridglea LLC) purchased the lease and all of the assets of
the ice rink business, except that Gainous kept the $30,000 security deposit that
she had paid when she signed the lease.  Ridglea LLC agreed to assume the
utility contracts for the premises, including the electricity service.  Ridglea
LLC also agreed to transfer a twenty-five percent ownership interest in the
entity to Ridglea Entertainment and to pay $75,000, in two installments of
$37,500 each, to Gainous and Ridglea Entertainment.  At trial, the parties
disputed whether the second installment was ever paid.

At
the same time, Gainous executed an assignment of the lease as well as an
assignment of the purchase option.  As part of the consideration for the
agreement, Ridglea LLC agreed to employ Sanderson as general manager of the ice
rink and to employ Gainous as a full-time employee.

Ridglea
Entertainment and Roustan Inc. (a company of which Roustan is the sole
stockholder) also executed an operating agreement for Ridglea LLC.  Under the
agreement, Roustan Inc. held a sixty-five percent ownership interest in Ridglea
LLC.  Ridglea Entertainment owned twenty-five percent, and two trusts each took
a five percent ownership interest.

The
agreement called for Roustan Inc. to make a $150,000 capital contribution to Ridglea
LLC, with $20,000 paid prior to formation and the remaining $130,000 due upon
formation.  Ridglea Entertainment’s capital contribution consisted of its
assignment of its interest in the ice rink and its sale of all of the business
assets as set out in the purchase agreement.  Roustan made an advance of
$20,000 prior to closing on the purchase agreement and another $55,000 around
the time of closing.  The parties disputed at trial whether Roustan Inc. ever
satisfied the rest of its capital contribution.

Attached
to the agreement as Exhibit 2 was an unexecuted promissory note, dated July 1,
2005, under which Ridglea LLC promised to pay the Fernandez Family Trust a sum
of $200,000 plus interest over a period of three years.  The operating
agreement provided that Roustan, the managing member, was authorized to pay the
note “as set forth in Exhibit ‘2.’”  This trust was not one of the two trusts
that received a five percent membership interest in Ridglea LLC.

By
October 2005, Ridglea LLC did not have enough money in its account to pay all
of its bills, and the business was not generating enough income to cover them. 
Roustan had not had the utilities transferred out of Gainous’s name, and in the
spring of 2006, the business began getting shut-off notices from the utility company
for failure to pay the rink’s bills.  S&G paid these bills with their
personal charge cards.

In
September 2006, the business continued to have trouble making money, and
Roustan informed S&G that he would not put any more money into the
business.  That same month, the electricity was shut off for failure to pay the
bill, and S&G paid $22,000 to have the service turned on again.  S&G also
received notice that month that there were insufficient funds to make payroll.

Sanderson
and Gainous notified Roustan that they would be taking the revenue from the ice
rink and putting it in Ridglea Entertainment’s account.  They paid the rent for
October and November.  After accepting that rent, YDIDI notified S&G that
the September rent had not been paid and that the lease was in default.  They
sent a check to YDIDI, but the entity held the check and, in December, evicted S&G.
 The next day, the rink opened up again for business, now under the management
of Firland Management LLC, a company used by Roustan to manage other ice rinks
in which he invests.

During
this time, Roustan’s lawyer was negotiating with YDIDI for a new lease and new
purchase option, but with a new company instead of with Ridglea LLC.  On
November 30, 2006, Roustan sent an email to a YDIDI representative stating that

[f]rom what I hear, [Sanderson] is having trouble getting
an Insurance Certificate for Ridglea Entertainment, Inc.  If your lawyer
demands to see one in 5 days, he might not be able to get one and would be in
default . . . . even though my policy is still in effect.  I am pretty certain
he will come up with the September rent and December rent.  Just a thought.

The
YDIDI representative responded, “I have forwarded your message to our attorney
. . . who is working on a specific notice to Sanderson.  I am confident we will
be able to prevail in the end.”  On December 18, 2006, the day after S&G
were locked out of the ice rink, Roustan registered a new corporation, Roustan
Fort Worth, LLC, with the Texas Secretary of State, using the ice rink’s
address as the registered address.

S&G
filed suit against Roustan; Ridglea LLC; Roustan Fort Worth, LLC; YDIDI; and
Firland Management, LLC.[2] 
S&G’s petition contained a seven-paragraph section with the heading “Causes
of Action Against the Roustan Defendants.”  In the first paragraph of that
section, they alleged that Roustan had made false representations “concerning
his business acumen, his financial strength[,] and his commitment to funding
the new company to which [S&G] sold the business.”  S&G then stated a
claim “for common law fraud and statutory fraud pursuant to Tex. Bus. &
Com. Code § 27.01.”

In a
separate paragraph in that section, S&G included the following claim: 
“Ridglea LLC failed to pay the second [half] of the purchase price and thereby
breached the contract of Purchase and Sale.  The breach of contract by [Ridglea
LLC] resulted in damages to [S&G].”

After
a trial, a jury found that Roustan had failed to comply with his agreement to
pay Sanderson and Gainous $75,000 for the transfer of the ice rink business,
and it assessed their damages at $37,500.  The jury further found that Roustan
had not failed to make the agreed $150,000 capital contribution and that he did
not agree to contribute the money for payment of Ridglea LLC’s operating
expenses.

The
jury also found that Roustan did not commit common law fraud against S&G
and that he did not “engage in any false, misleading, or deceptive act or
practice that [S&G] relied on to their detriment and that was a producing
cause of damages to [S&G].”  The jury did find that Roustan committed
statutory fraud against S&G, but it awarded statutory fraud damages only to
Ridglea Entertainment, in the amount of $50,000.

Roustan
filed a motion for judgment notwithstanding the verdict.  The trial court
denied the motion and entered judgment ordering that Sanderson and Gainous
recover from Roustan $37,500 plus prejudgment interest and that Ridglea
Entertainment recover from Roustan $50,000.

Analysis

Roustan’s
first two issues relate to S&G’s breach of contract claim.  His third,
fourth, fifth, and sixth issues relate to S&G’s statutory fraud claim.

Breach
of Contract Claim

In
Roustan’s second issue, he argues that the evidence is legally and factually
insufficient to support the jury’s verdict on S&G’s breach of contract
claim because there is no evidence that Roustan made any agreement with them in
his personal capacity.  We agree.

The
jury found that Roustan had agreed to pay Sanderson and Gainous $75,000 for the
transfer of the ice rink business.  The agreement regarding the transfer of the
business was contained in the purchase and sale contract, which was between
S&G and Ridglea LLC, not Roustan individually.  Roustan signed the
agreement as president of Roustan, Inc., which signed as the managing member of
Ridglea LLC.  Accordingly, Ridglea LLC may be liable for a breach of the
contract to which it is a party, but Roustan as an officer may not be held
individually liable.[3] 
Roustan could, through his actions, cause Ridglea LLC to breach the agreement,[4] but
because he was not a party to the contract, he could not personally breach it.[5] 
S&G did not plead any facts or provide sufficient evidence to support a
ground for ignoring the limitation on liability afforded to limited liability
companies and did not allege that the limitation should be disregarded.[6]  By
statute, a member of a limited liability company is not liable for a debt, obligation,
or liability of the company.[7] 
Fraud is a ground for disregarding the corporate form,[8] but
although S&G pled that Roustan fraudulently induced them to enter a
contract, they did not plead that Roustan used the LLC itself to perpetrate a
fraud and that, consequently, the corporate form should be disregarded and
Roustan held individually liable.[9] 
Nor did they plead any other ground for disregarding the corporate structure.[10]

S&G
argue in their brief that they “had always understood that Roustan would be
paying the $75,000 cash portion of the purchase price[,] and it was not until
shortly before closing when they received the purchase agreement that they
understood Roustan had put a provision in the purchase agreement that the new
company would be paying the second half.”  They then contend that they “had a
conversation with Roustan about their concerns with capital calls and Roustan
had told them that he would personally pay any monetary shortfalls during the
first [twelve] months of the operation of the company,” and they therefore “had
every reason to believe that Roustan was standing by his personal commitment on
the purchase price.”

S&G
may have put on some evidence of statements Roustan made before or after the
contract’s formation about the source of funding for the $37,000, but they did
not put on evidence of a separate contract with Roustan personally to pay them
the money.  The only contract that they pled had been breached was the purchase
agreement, and this was the only agreement that they proved existed.[11] 
Roustan was not a party to this agreement, and S&G did not put on evidence
to support the disregarding of the corporate form to hold him personally
liable.[12] 
Because they neither pled nor proved a ground for setting aside the corporate form
to hold Roustan personally liable on the purchase agreement, and because they
neither pled nor proved a separate contract with Roustan, he cannot be held
individually liable for breach of contract.[13] 
Accordingly, applying the appropriate standard of review,[14] we
sustain Roustan’s second issue.

Because
S&G failed to establish a basis for holding Roustan personally liable, we
do not need to reach Roustan’s first issue, in which he argues that the
pleadings did not support a verdict of personal liability on the contract.[15]

Statutory
Fraud

The
remainder of Roustan’s issues relate to the jury’s verdict of statutory fraud. 
In his third issue, he argues that there is no evidence that he made any representation
that was false.

S&G
pled a claim for fraud involving real estate or corporate stock under section
27.01 of the business and commerce code.[16]  To
show fraud under section 27.01, a plaintiff may prove either (1) a false
representation of a material fact or (2) a false, material promise to do an
act.[17]  If
the plaintiff’s claim is based on a false representation of fact, the plaintiff
must show a “false representation of a past or existing material fact, when the
false representation is . . . made to [the plaintiff] for the
purpose of inducing [the plaintiff] to enter into a contract; and . . .
relied on by [the plaintiff] in entering into that contract.”[18]  If
the claim is based on a false promise to act, the plaintiff must show that the
false promise was material, made to the plaintiff with the intention of not
fulfilling it and for the purpose of inducing the plaintiff to enter into a
contract, and that the plaintiff relied on the promise in entering into that
contract.[19]

The
jury charge tracked section 27.01, instructing the jury that statutory fraud
can occur when either (a) there is a false representation of a past or existing
material fact or (b) a party makes a false promise to do an act.  In the short
section of Roustan’s appellate brief addressing this issue, he asserts that
“[t]here was no evidence of any representation by [him] that was false in any
respect.”  He does not, however, argue that there is no evidence that he made a
promise to do something with the intention of not fulfilling it.

In
his reply brief, however, Roustan does make one argument regarding the evidence
to support a finding of a false promise in a sentence in a footnote of the
brief.  He states that testimony suggesting that he failed to perform on any of
his promises cannot support a fraud claim because Texas cases have consistently
held that failure to perform an agreement cannot support a fraud claim.  We
agree with the statement that under Texas law, proof of the failure to perform,
without more, does not establish fraud.[20] 
But circumstantial evidence may be used to establish that, when making the
promise, the party had no intention to perform.[21]  A
party’s acts after the promise was made, the party’s denial that he ever made a
promise, and no pretense of performance are all factors that may be considered
to show a lack of intent.[22]

Roustan
makes no argument that the evidence was insufficient to show that in order to
induce S&G to enter into a contract, he made a promise with the intention
of not fulfilling it.  Furthermore, Gainous’s and Sanderson’s testimony
indicates that Roustan led them to believe that he and his business enterprise
had the financial wherewithal to provide the funding to keep their business
going and that he would in fact provide the funding.  The emails from Roustan
in the record do nothing to contradict this testimony.  For example, when the
parties were still negotiating the deal, Roustan told Sanderson that he
would pay $20,000 up front and then, after formation of the LLC and the
assignment of the lease, “[he] would then provide an additional
$130,000.”  [Emphasis added.]  Roustan did nothing to disillusion S&G after
they formed the LLC; in February 2006, Sanderson asked Roustan about the second
payment of $35,000, and in response Roustan asked them to wait on payment
because “it would make life easier on [him].”  [Emphasis added.]  No
mention was made of funding the business by taking out a loan.  Neither the
operating agreement nor the note attached to it indicated that the trust loan
was not an additional source of funds and was instead the primary source of Roustan’s
contribution to the LLC.  The evidence in the record was enough for the jury to
conclude that Roustan told S&G that he could and would provide a capital
contribution of $150,000, either with his own funds or with the financial
resources of his business, but that he actually borrowed money on behalf of the
LLC.  The record therefore contains sufficient evidence that Roustan made a
promise to S&G that went unfulfilled.

Roustan
does not argue that, even if he did not follow through on a promise, such promise
was nevertheless not made with an intention not to fulfill it.  Even if he had
so argued, however, our conclusion would be the same.  From Roustan’s testimony
about how he structures business deals, his opinion about the note’s
satisfaction of his capital obligation, and the operating agreement’s provision
making repayment of the loan the obligation of the LLC rather than Roustan,
Inc., the jury could have concluded that Roustan never intended to make a
capital contribution from his own funds or the funds of Roustan, Inc. and that
he had always intended to fund the business by way of a debt that the LLC would
have to repay.  Accordingly, the jury could have found that Roustan’s borrowing
money to fund the LLC and making the LLC liable for the repayment satisfied
Roustan’s obligation to make a capital contribution but at the same time
violated his promise to S&G that he personally could and would fund the
company.

Roustan
does not argue that the promise to provide funding out of his own funds or his
business’s funds was not material.  Nor does he argue that the evidence was not
sufficient to show that S&G relied on the promise or to show that the
promise was made to induce them to sign the purchase and sale agreement and the
assignments.  Accordingly, we do not address the sufficiency of the evidence as
to those elements of S&G’s claim.  We overrule Roustan’s third issue.

In
his fourth issue, Roustan argues that the judgment does not conform to the
pleadings.  The entirety of his argument on this issue is as follows:

[Texas Rule of Civil Procedure] 301 requires a judgment
to conform to the pleadings.  As mentioned above, [S&G] assert in the
[p]etition that Roustan made false “representations concerning his business
acumen, his financial strength and his commitment to funding the new
company.” . . . However, as discussed above, such
representations (even if made) cannot support a judgment of fraud under Texas
law[.]  See, Stephanz v. Laird, 846 S.W.2d [895,] 903 [(Tex.
App.—Houston [1st Dist.] 1993, writ denied)].  Thus, the [j]udgment against
Roustan for statutory fraud does not conform to the pleadings.

Roustan
expands on his argument somewhat in his reply brief, in which he asserts that
as a matter of law, the allegations that he made false “representations
concerning his business acumen, his financial strength and his commitment to
funding the new company” cannot support a claim for fraud because “the
representation complained of must concern a ‘material fact’ and not ‘a mere
matter of opinion, judgment, probability, or expectation.’”  Thus, he argues,
the petition failed to plead any grounds that would support a fraud claim.

In
the case relied on by Roustan, the court looked to see if the evidence
supported a finding of misrepresentation, not a finding of a false promise to
do an act.  Roustan does not explain why the pleadings cannot support a
judgment that he committed statutory fraud based on a false promise.

In
the paragraph of the pleadings pointed out by Roustan, S&G did state that
Roustan made false representations about his business ability, his finances,
and his commitment to funding the new company.  They assert that these
representations were made with knowledge of their falsity with the intent of
inducing them to enter into the purchase and sale agreement, and “[S&G]
assert an action for common law fraud and statutory fraud pursuant to Tex. Bus.
& Com. Code § 27.01” based on the purchase and sale agreement and the
assignments.  But S&G did not limit their statutory cause of action to a
claim based on false representations under section 27.01(a)(1).  And in their
pleadings, S&G alleged that Roustan misled them about his commitment to
funding the new company and that Roustan had represented to them that he had
financial capital to put into the business and to exercise the purchase option
“so that the new entity he would form would own the [p]roperty.”  Although
S&G used the term “representations,” a term that generally relates to
assertions of fact rather than promises, these statements were sufficient to
put Roustan on notice of a claim based on statements by him that he would
perform acts in the future with respect to funding the new company and
purchasing the property.[23] 
Roustan makes no argument about why, if S&G proved that Roustan made
promises about funding the business, such promises could not serve as the basis
of a section 27.01(a)(2) claim.[24] 
The pleadings can support a judgment for statutory fraud based on a false
promise, and, accordingly, we overrule this issue.

In
Roustan’s fifth issue, he argues that the jury’s finding that he committed statutory
fraud was inconsistent with its findings as to common law fraud.  In reviewing
the jury findings for conflict, a court may not strike down jury answers as
conflicting if there is any reasonable basis upon which they can be reconciled.[25] 
The question for this court is not whether the findings may reasonably be
viewed as conflicting but whether there is any reasonably possible basis upon
which they may be reconciled.[26]

In
Roustan’s original brief, he does not explain why the jury’s findings are
inconsistent and irreconcilable.[27]  In
his reply brief, however, he argues that under the common law fraud question,
the jury found that he did not make a false representation, but the jury’s
answer to statutory fraud requires a finding that he did make a false
representation.  Thus, he argues, the findings are in conflict and are
irreconcilable.

We
disagree.  The jury’s answers are not irreconcilable.  The jury charge on
common law fraud limited liability to the making of misrepresentations, which
the charge defined as a false statement of fact or opinion.  The statutory
fraud definition, however, allowed the jury to find that Roustan had committed
fraud either by making a misrepresentation or by making a false
promise to do an act.  The jury could have found that Roustan did not make a
false statement of fact or opinion and therefore did not commit common law
fraud but that Roustan did make a false promise to do an act and therefore
did commit statutory fraud.

Furthermore,
when the jury returned its verdict, Roustan did not object to the findings as
conflicting.[28] 
We overrule this issue.

In
his sixth issue, Roustan contends that the trial court submitted an improper
instruction on damages concerning statutory fraud.  The jury charge asked the jury,

What sum of money, if any, if paid now in cash, would
fairly and reasonably compensate [S&G] for their damages, if any, that
resulted from such statutory fraud?

Consider the following elements of damages, if any, and
none other:

1.  The economic losses, if any, suffered by [S&G]
caused by the [statutory] fraud.

The
jury charge instructed the jury to determine “economic losses” but did not
define that term.  In Roustan’s brief on appeal, he argues that the measure of
damages for fraud was discussed by the Supreme Court of Texas in Formosa
Plastics,[29] in
which that court stated that Texas recognizes two measures of direct damages
for fraud:  out-of-pocket and benefit-of-the-bargain.  Thus, Roustan argues,
the trial court’s instruction was contrary to Texas law because the proper
measure of damages for a fraud claim is either out-of-pocket damages or
benefit-of-the bargain damages.

Section
27.01 provides that a plaintiff under that section may recover “actual
damages,” and, in some cases, exemplary damages.[30] 
The statute does not define the term “actual damages,” so we look to the common
law for guidance.[31] 
Under the common law, both out-of-pocket and benefit-of-the-bargain damages are
methods of measuring direct actual damages.[32] 
Economic damages are measured the same way, and in fact courts often use the
terms “economic damages” and “actual damages” interchangeably.[33] 
Thus, the jury charge set forth the correct kind of damages recoverable on a
statutory fraud claim.  To the extent that the terms are not interchangeable,
Roustan was not harmed by the trial court’s use of the term “economic damages”
instead of “actual damages” because “actual damages” could have allowed for
greater recovery in that “actual damages” can include both economic and
non-economic damages.[34]  In
sum, out-of-pocket and benefit-of-the-bargain are both measures of “actual
damages” and of “economic damages.”

In
his reply brief, Roustan argues that a proper instruction on damages would have
“set forth” the “out-of-pocket” and “benefit-of-the-bargain” measures.  We
construe Roustan’s issue liberally to argue, not that the instruction failed to
name the proper measure of damages recoverable, but that it failed to
instruct the jury on how to calculate those damages, that is, that the
charge should have instructed the jury to determine either the difference
between the value S&G paid and the value of what they received
(out-of-pocket damages) or the difference between the value as represented and
the value as received (benefit-of-the-bargain damages).[35]

In
the charge conference, Roustan’s attorney objected to the damages question,
stating that

the measure of damages stated here is not one of the
measures of damages for fraud recognized by Texas law.  It just says the economic
losses.  And the proper definitions for fraud would be benefit of the bargain
or out-of-pocket or one of the other recognized measures, and this is not
one of them.  [Emphasis added.]

This
objection was not sufficient to advise the trial court of Roustan’s objection
that the charge was defective for failing to instruct the jury how to calculate
benefit-of-the-bargain damages and out-of-pocket damages.  Roustan argued only
that economic losses were not a proper measure of fraud damages.  Thus, to the extent
that Roustan argues that the trial court should have instructed the jury on how
to calculate the damages, he has not preserved the complaint.[36]  To
the extent that Roustan’s reply brief merely repeats the argument from his
original brief, the argument is overruled because “economic losses” are an
appropriate measure of damages for the statutory fraud claim alleged.  We
overrule Roustan’s sixth issue.

Conclusion

Having
sustained Roustan’s second issue, we reverse the part of the trial court’s
judgment awarding S&G damages on their breach of contract claim and render
judgment that they take nothing on the breach of contract claim.  We affirm the
remainder of the trial court’s judgment.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL: 
DAUPHINOT, WALKER, and GABRIEL, JJ.

 

GABRIEL,
J. concurs without opinion.

DELIVERED:  September 29,
2011









[1]See Tex. R. App. P. 47.4.





[2]They subsequently
dismissed their claims against Firland and YDIDI.





[3]See Willis v. Donnelly,
199 S.W.3d 262, 271 (Tex. 2006) (“A bedrock principle of corporate law is that
an individual can incorporate a business and thereby normally shield himself
from personal liability for the corporation’s contractual obligations.”).





[4]See In re Vesta Ins.
Group, Inc., 192 S.W.3d 759, 762 (Tex. 2006) (orig. proceeding) (noting
that “corporations must act through human agents”).





[5]See Bernard Johnson,
Inc. v. Cont’l Constructors, Inc., 630 S.W.2d 365, 369 (Tex. App.—Austin
1982, writ ref’d n.r.e.) (“As a general rule, a suit for breach of contract may
not be maintained against a person who is not a party to the contract.”).





[6]See Castleberry v.
Branscum, 721 S.W.2d 270, 272 (Tex. 1986) (setting out six grounds on which
the corporate form may be disregarded), superseded in part by Act
effective Sept. 1, 1997, 75th Leg., R.S., Ch. 375, § 7, 1997 Tex. Gen. Laws
1522, 1522–23 (amended 2003 & 2007) (current version at Tex. Bus. Orgs.
Code Ann. § 21.223 (West 2010)); see also SSP Partners v. Gladstrong Inv.
(USA) Corp., 275 S.W.3d 444, 451–52 (Tex. 2008) (stating that the
limitation on corporate liability may be ignored “only ‘when the corporate form
has been used as part of a basically unfair device to achieve an inequitable
result’”); McCarthy v. Wani Venture, A.S., 251 S.W.3d 573, 590 (Tex.
App.—Houston [1st Dist.] 2007, pet. denied) (noting that Texas courts have
applied to limited liability corporations the same state law principles for
piercing the corporate veil that they have applied to corporations).





[7]Act effective Aug. 26,
1991, 72nd Leg., R.S., Ch. 901, § 46, 1991 Tex. Gen. Laws 3192, 3203 (now
renumbered and codified at Tex. Bus. Orgs. Code Ann. § 101.114 (West 2010)).





[8]See Castleberry,
721 S.W.2d at 272.





[9]Cf. Houston-Am. Life
Ins. Co. v. Tate, 358 S.W.2d 645, 657 (Tex. Civ. App.—Waco 1962, no writ)
(holding that the corporate fiction was used to perpetrate a fraud and that adherence
to the corporate fiction “would promote injustice and lead to a most
inequitable result”).





[10]See Castleberry,
721 S.W.2d at 272; see also Blond Lighting Fixture Supply Co. v. Funk,
392 S.W.2d 586, 591 (Tex. Civ. App.—San Antonio 1965, no writ) (holding that
there was no justification for disregarding the corporate form when the
plaintiffs did not present evidence that the corporation was formed as a means
of perpetrating fraud, that it was operated as a mere tool of another
corporation or as the alter ego of an individual, that the corporate form was
being used as a means of evading existing obligations, or that the corporation
was used to circumvent a statute, protect crime, or justify wrong).





[11]See Fieldtech Avionics
& Instruments, Inc. v. Component Control.Com, Inc., 262 S.W.3d
813, 825 (Tex. App.—Fort Worth 2008, no pet.) (stating that the elements of a
breach of contract claim include the existence of a valid contract).





[12]See Castleberry,
721 S.W.2d at 272.





[13]See Bernard Johnson,
Inc., 630 S.W.2d at 369.





[14]Cent. Ready Mix
Concrete Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller
v. Wilson, 168 S.W.3d 802, 807, 827 (Tex. 2005); Uniroyal Goodrich Tire
Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526
U.S. 1040 (1999).





[15]See Tex. R. App.
P. 47.1.





[16]Tex. Bus. & Com. Code
Ann. § 27.01(a) (West 2009).





[17]Id.





[18]Id.





[19]Id.





[20]Formosa Plastics Corp.
USA v. Presidio Eng’rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.
1998).





[21]See Spoljaric v.
Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986).





[22]See id.; see
also Aquaplex, Inc. v. Rancho La Valencia, Inc., 297 S.W.3d 768, 775
(Tex. 2009) (“[A] party’s intent is determined at the time the party made the
representation, [but] it may be inferred from the party’s subsequent acts after
the representation is made.”) (quoting Spoljaric, 708 S.W.2d at 434).





[23]See Horizon/CMS
Healthcare Corp. v. Auld, 34 S.W.3d 887, 896–97 (Tex. 2000) (noting that
Texas follows a fair notice standard for pleading, that a petition is
sufficient if it gives fair and adequate notice of the facts upon which the
pleader bases his claim, that when a party fails to specially except to a
pleading, a court should construe the pleadings liberally in favor of the
pleader, and that “it is hard to imagine that [Appellee] was unaware of exactly
what [Appellant] was claiming”).





[24]See Tex. R. App.
P. 38.1(i).





[25]Bender v. S. Pac.
Transp. Co., 600 S.W.2d 257, 260 (Tex. 1980).





[26]Id.





[27]See Tex. R. App.
P. 38.1(i).





[28]See Columbia Med. Ctr.
of Las Colinas v. Bush, 122 S.W.3d 835, 861 (Tex. App.—Fort Worth 2003,
pet. denied) (holding that the appellants did not preserve complaint about
conflicting jury findings because they failed to object to the conflict before
the jury was discharged).





[29]960 S.W.2d at 49.





[30]Tex.
Bus. & Com. Code Ann. § 27.01(b), (c).





[31]Hawkins v. Walker,
233 S.W.3d 380, 391–92 (Tex. App.—Fort Worth 2007, no pet.) (applying without
discussion the common law measure of damages for fraud in a section 27.01 statutory
fraud case); see also Swinnea v. ERI Consulting Eng’rs, Inc., 236
S.W.3d 825, 836 (Tex. App.—Tyler 2007) (looking to the common law for guidance
and stating that “[t]he measure of damages recoverable under [s]ection 27.01 is
the same as that under a claim of common law fraud”), rev’d in part on other
grounds, 318 S.W.3d 867 (Tex. 2010).





[32]See Arthur Andersen
& Co. v. Perry Equip. Corp., 945 S.W.2d 812, 817 (Tex. 1997) (stating
that under the common law, actual damages can be either direct or consequential
and that direct damages for misrepresentation may be measured as out-of-pocket
or as benefit-of-the-bargain damages); Everett v. TK-Taito, L.L.C., 178
S.W.3d 844, 858 (Tex. App.—Fort Worth 2005, no pet.) (noting that
“out-of-pocket” and “benefit-of-the-bargain” are the two common law measures of
economic damages).





[33]See Matheus v. Sasser,
164 S.W.3d 453, 458 (Tex. App.—Fort Worth 2005, no pet.) (noting that current
version of the Deceptive Trade Practices Act provides for “economic damages,”
that the prior version called for “actual damages,” and that we had found no
case suggesting that the terms had any difference in meaning).





[34]See, e.g., Latham v.
Castillo, 972 S.W.2d 66, 69 (Tex. 1998) (noting that mental anguish damages
are actual damages recoverable at common law for some torts).





[35]See Arthur
Andersen, 945 S.W.2d at 817 (defining out-of-pocket and benefit-of-the-bargain
damages).





[36]See Tex. R. App.
P. 33.1.